FILED

2022 Sep-28  PM 02:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **Bed Bath & Beyond Inc.; Automobile Club of Southern California; Darling Ingredients Inc.; Griffin Industries, LLC; Dillard's, Inc.; Halliburton Energy Services, Inc.; Kimberly-Clark Corporation; Lincoln National Corporation; Live Nation Entertainment, Inc.; Nestlé USA, Inc.; Perdue Farms Inc.; Pacific Gas and Electric Company; PG&E Corporation; Raytheon Technologies Corporation; Raytheon Company; Rockwell Collins, Inc.; Rite Aid Corporation; Rite Aid Hdqtrs. Corp.; Sterling Jewelers Inc.; Zale Corporation; Zale Delaware, Inc.; Starbucks Corporation; and Tyson Foods, Inc.,** | **JURY TRIAL DEMANDED** |
| **Plaintiffs,** | |
| **vs.** | **Case No.** |
| **Anthem, Inc., f/k/a WellPoint, Inc. d/b/a Anthem Blue Cross Life and Health Insurance Company, Blue Cross of California, Blue Cross of Southern California, Blue Cross of Northern California (Blue Cross of California, Blue Cross of Southern California and Blue Cross of Northern California are referred to herein, together, as "Anthem-CA"), and Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. ("Anthem-GA"), and also does business through its subsidiaries or divisions, including, Anthem Health Plans, Inc. d/b/a Anthem Blue Cross Blue Shield of Connecticut ("Anthem-CT"), Rocky Mountain Hospital & Medical Service, Inc. d/b/a Anthem Blue Cross Blue Shield of Colorado ("Anthem-CO") and Anthem Blue Cross Blue Shield of Nevada ("Anthem-NV"), Anthem Insurance Companies, Inc. d/b/a/ Anthem Blue Cross Blue Shield of Indiana ("Anthem-IN"), Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross Blue Shield of Kentucky ("Anthem-KY"), Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross Blue Shield of Maine ("Anthem-ME"), Anthem Blue Cross Blue Shield of Missouri,** | |

**RightCHOICE Managed Care, Inc., Healthy Alliance Life Insurance Company and HMO Missouri Inc. (together, "Anthem-MO"), Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross Blue Shield of New Hampshire ("Anthem-NH"), Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross Blue Shield ("Anthem-Empire"), Community Insurance Company d/b/a Anthem Blue Cross Blue Shield of Ohio ("Anthem-OH"), Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia ("Anthem-VA"), Anthem Blue Cross Blue Shield of Wisconsin, and Compcare Health Services Insurance Corporation (together, "Anthem-WI"), Elevance Health, Inc.; Aware Integrated, Inc. and BCBSM, Inc., d/b/a Blue Cross and Blue Shield of Minnesota ("Aware"); Blue Cross and Blue Shield of Alabama ("BCBS-AL"); Blue Cross and Blue Shield of Arizona, Inc. ("BCBS-AZ"); Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho ("Idaho Health"); Blue Cross and Blue Shield of Kansas ("BCBS-KS"); Blue Cross and Blue Shield of Kansas City ("BCBS-KS"); Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBS-MA"); Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBS-MI"); Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company ("BCBS-MS"); Blue Cross and Blue Shield of North Carolina ("BCBS-NC"); Blue Cross and Blue Shield of Rhode Island ("BCBS-RI"); Blue Cross and Blue Shield of South Carolina ("BCBS-SC"); Blue Cross Blue Shield of Tennessee, Inc. ("BCBS-TN"); Blue Cross and Blue Shield of Vermont ("BCBS-VT"); Blue Cross and Blue Shield of Wyoming ("BCBS-WY"); California Physicians' Service, d/b/a Blue Shield of California ("California Physicians' Service"); Cambia Health Solutions, Inc., and its affiliates and/or assumed names Regence BlueShield of Idaho ("Cambia-ID"), Regence Blue Cross Blue Shield of Oregon ("Cambia-OR"), Regence Blue Cross Blue Shield of Utah ("Cambia-UT"), and Regence Blue Shield (of Washington) ("Cambia-WA"); Capital Blue Cross ("Capital"); CareFirst, Inc. and its**

subsidiaries or affiliates Group Hospitalization and Medical Services, Inc., CareFirst of Maryland, Inc., and CareFirst BlueChoice, Inc., which collectively d/b/a CareFirst BlueCross BlueShield (CareFirst, Inc., CareFirst of Maryland, Inc. and CareFirst BlueChoice, Inc. are referred to herein, together, as "CareFirst-MD", and CareFirst, Inc., Group Hospitalization and Medical Services, Inc. and CareFirst BlueChoice, Inc. are referred to herein, together, as "CareFirst-DC"); GoodLife Partners, Inc. and Blue Cross and Blue Shield of Nebraska (together "GoodLife"); GuideWell Mutual Holding Corporation and Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue (together "GuideWell"); Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii ("Hawaii Medical"); Health Care Service Corporation, a Mutual Legal Reserve Company d/b/a Blue Cross and Blue Shield of Illinois ("HCSC-IL"), Blue Cross and Blue Shield of Montana, ("HCSC-MT"), including its predecessor Caring for Montanans, Inc., Blue Cross and Blue Shield of New Mexico ("HCSC-NM"), Blue Cross and Blue Shield of Oklahoma ("HCSC-OK"), and Blue Cross and Blue Shield of Texas, a Division of Health Care Service Corporation, a Mutual Legal Reserve Company ("HCSC-TX"); HealthyDakota Mutual Holdings and Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota (together "Noridian"); Highmark, Inc. and Highmark Health both d/b/a Highmark Blue Shield and Highmark Blue Cross Blue Shield and including Highmark Inc. predecessor Hospital Service Association of Northeastern Pennsylvania f/d/b/a Blue Cross of Northeastern Pennsylvania (together, "Highmark-PA"); Highmark Blue Cross Blue Shield Delaware Inc. d/b/a Highmark Blue Cross Blue Shield Delaware ("Highmark-DE"), Highmark West Virginia Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia ("Highmark-WV"); Highmark Inc. affiliates HealthNow New York Inc. and HealthNow Systems, Inc. together d/b/a Highmark Blue Cross Blue Shield of Western New York and f/d/b/a

**BlueCross BlueShield of Western New York
("Highmark Western NY") and Highmark Blue
Shield of Northeastern New York f/d/b/a
BlueShield of Northeastern New York
("Highmark Northeastern NY"); Horizon
Healthcare Services, Inc., d/b/a Horizon Blue
Cross Blue Shield of New Jersey ("BCBS-NJ");
Independence Health Group, Inc. and
Independence Hospital Indemnity Plan, Inc., its
subsidiary or division Independence Blue Cross,
and QCC Insurance Company (together
"Independence"); Lifetime Healthcare, Inc. and
Excellus Health Plan, Inc., d/b/a Excellus
BlueCross BlueShield (together "Excellus");
Louisiana Health Service & Indemnity Company
d/b/a Blue Cross and Blue Shield of Louisiana
("Louisiana Health"); Premera and Premera Blue
Cross ("Premera-WA"), which also does business
as Premera Blue Cross Blue Shield of Alaska
("Premera-AK"); Triple-S Management
Corporation and Triple S-Salud, Inc. ("Triple-
S"); USAble Mutual Insurance Company d/b/a
Arkansas Blue Cross and Blue Shield and as Blue
Advantage Administrators of Arkansas
("USAble"); Wellmark, Inc., including its
subsidiaries and/or divisions, Wellmark Blue
Cross and Blue Shield of Iowa ("Wellmark-IA")
and Wellmark of South Dakota, Inc. d/b/a/
Wellmark Blue Cross and Blue Shield of South
Dakota ("Wellmark-SD") (collectively,
"Wellmark"); and the Blue Cross and Blue Shield
Association ("BCBSA"),**

**Defendants.**

**COMPLAINT**

# TABLE OF CONTENTS

I.     DESCRIPTION OF THE CASE ................................................................. 1

II.    JURISDICTION AND VENUE ................................................................. 3

III.   THE PARTIES ........................................................................................... 7

IV.    NATIONAL ACCOUNTS, ASO SERVICES, STOP-LOSS INSURANCE, AND THE RELEVANT MARKET ............................................................. 39

V.     HISTORY OF THE DEFENDANT INSURANCE COMPANIES AND BCBSA ...................................................................................................... 50

       A.     Development of the Blue Cross Companies..................................... 51

       B.     Development of the Blue Shield Plans............................................. 52

       C.     The Rise of Self-Funded Insurance ................................................. 53

       D.     Creation of the Blue Cross and Blue Shield Association................. 54

VI.    CONTROL OF BCBSA BY DEFENDANT INSURANCE COMPANIES............. 61

VII.   LICENSE AGREEMENTS AND RESTRAINTS ON COMPETITION ................. 65

VIII.  THE HORIZONTAL AGREEMENTS NOT TO COMPETE ................... 67

IX.    THE BCBSA LICENSE AGREEMENTS HAVE INJURED COMPETITION FOR NATIONAL ACCOUNTS THROUGHOUT THE UNITED STATES.......................................................................................... 78

X.     DEFENDANTS' CONDUCT HAS NO PROCOMPETITIVE JUSTIFICATIONS .................................................................................... 80

XI.    THE PUTATIVE SUBSCRIBER CLASS ACTION SETTLEMENT ...................... 81

XII.   TOLLING OF THE STATUTE OF LIMITATIONS ............................... 83

XIII.  VIOLATIONS ALLEGED ........................................................................ 84

       Count One (*Per Se* Violations of §§ 1 and 3 of the Sherman Act)................. 84

       Count Two (Rule of Reason Violations of §§ 1 and 3 of the Sherman Act) .................................................................................................. 85

XIV.   RELIEF REQUESTED ............................................................................. 89

## I.    DESCRIPTION OF THE CASE

1.      Plaintiffs bring this action under the Federal antitrust laws to address collusion among separate economic actors that should compete with one another for the sale of health insurance services to Plaintiffs and others.  The Plaintiffs are employer-sponsors of welfare benefit plans.  The Plaintiffs purchase administrative services,[1] frequently alongside stop-loss insurance,[2] from one or more of the Defendant Insurance Companies,[3] pursuant to administrative services contracts.  The Plaintiffs seek to recover damages and other relief arising from a continuing conspiracy between and among Defendant Insurance Companies and BCBSA to restrict output and to allocate customers across the United States in violation of §§ 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and causing damages under § 4 of the Clayton Act (15 U.S.C. § 15).  Such damages include the difference between what Plaintiffs paid individual Defendant Insurance Companies for administrative services and stop-loss insurance and the lower competitive prices Plaintiffs would have paid but for Defendant Insurance Companies' illegal conduct.

---

[1]      Plaintiffs are sponsors of self-insured welfare benefit plans.  Under such plans, the group contracts with an insurance company to administer the plan, but the group bears some or all of the risk of loss associated with offering health benefits.  Defendants, in turn, act under these contracts as administrators of the plan, of the plan's benefits, or of both, in full or in part.  This type of contract is commonly referred to as an "administrative services only" agreement or an "ASO" agreement.  *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2016 WL 3029783 (N.D. Cal. May 27, 2016); *also see* ¶ 205, *infra*.  ASO services, as used in this complaint, encompasses all forms of administrative services, including joint administrative arrangements and network administration agreements.

[2]      Stop-loss insurance is an insurance product that protects the covered purchaser against unexpected catastrophic losses.  Self-funded insurance sponsors that contract with insurance providers for ASO services often buy stop-loss insurance to cap the plan's losses from unexpected health care expenses.  Insurance companies may bundle ASO services and stop-loss insurance as a package deal.

[3]      "Defendant Insurance Companies" refers to all of the Defendants except for BCBSA.

2.      The individual Defendant Insurance Companies, which own and jointly control

BCBSA, are engaged in interstate commerce and in activities substantially affecting interstate

commerce.  The unlawful conduct alleged herein substantially affects interstate commerce.  Each

Defendant Insurance Company has agreed, with each of the other Defendant Insurance

Companies by, with and through the BCBSA, to allocate National Account customers and refrain

from competing against each other to provide Blue Cross and/or Blue Shield-branded health

insurance services to such customers, including Plaintiffs.  In addition to allocating customers,

the Defendants have combined and conspired to implement additional output-reducing restraints

on the Defendant Insurance Companies' ability to compete against each other or other non-

defendant insurance conspirators for the sale of health insurance services.  Among other

restrictive output-reducing agreements, the Defendant Insurance Companies and BCBSA have

agreed to adhere to (1) a National Best Efforts Rule, which precludes each Defendant from

obtaining more than 33% of its revenue from the sale of services that do not carry a Blue Cross

or Blue Shield brand or trademark, and (2) a Local Best Efforts Rule, which requires that 80% of

the revenue received by a Defendant Insurance Company from within an allocated territory come

from the sale of services using a Blue Cross and/or Blue Shield mark.  The effect and intention

of these restraints is to ban all competition among Defendant Insurance Companies.

3.      Defendant Insurance Companies provide commercial health insurance services

covering residents of their respective allocated geographic territories (which together include all

50 states, the District of Columbia, and Puerto Rico), sell those insurance services to National

Accounts across state lines, provide access and payments to providers for covered individuals

when those persons travel across state lines, purchase health care in interstate commerce when

covered individuals seek health care out-of-state, and receive payments from the employers, plan

sponsors, plan administrators, trustees, and health plans located in other states on behalf of covered individuals.

4.    Through their anticompetitive conduct, Defendant Insurance Companies have been able to charge supracompetitive fees and prices to National Accounts like Plaintiffs.  This anticompetitive behavior and the lack of competition that Defendants engineered through their customer allocation scheme and/or output restrictions have caused Plaintiffs to pay Defendant Insurance Companies and other competitors supracompetitive prices for health insurance services.

5.    The Defendant Insurance Companies would not have been able to charge these inflated prices and fees but for the illegal customer allocation scheme and/or output restrictions agreed on by the Defendants.  The illegal conduct has had the actual and intended effect of restricting the ability of a significant portion of the nation's largest health insurance companies to compete with each other for the provision of health insurance services to customers such as the Plaintiffs.

## II.    **JURISDICTION AND VENUE**

6.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because Plaintiffs bring their claims under §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to recover treble damages and costs of suit, including reasonable attorneys' fees, and injunctive relief against the Defendants for the injuries sustained by Plaintiffs from Defendants' violations of §§ 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

7.    This Court has personal jurisdiction over each Defendant pursuant to § 12 of the Clayton Act (15 U.S.C. § 22) under one or more of the theories below:

a.    In approving the class action settlement the Plaintiffs have since opted out from, the Northern District of Alabama in Case No. 2:13-cv-20000-RDP

("MDL Court") stated that Defendants "submitted to the exclusive jurisdiction of [the MDL Court] for any suit, action, proceeding, or dispute arising out of or relating to the Settlement Agreement . . . ." *In re Blue Cross Blue Shield Antitrust Litigation,* MDL 2406 ("*BCBS MDL*"), Case No. 2:13-cv-20000-RDP, ECF No. 2931 at 90.  The MDL Court further stated that Defendants "have agreed that, in the event of such dispute, they are and shall be subject to the jurisdiction of [the MDL Court] and that [the MDL Court] is a proper venue and convenient forum." *Id.*; and/or

b.  As the MDL Court previously found, Defendants "have conducted substantial business in this district" (*BCBS MDL*, ECF No. 925 at 24); and/or

c.  As the MDL Court previously found, Defendants "all have subscribers throughout the United States (including some within in the Northern District), they all have entered into the BlueCard Program to access a nationwide provider network, and they all settle (and have settled) claims made by providers in the Northern District through the BlueCard Program." (*BCBS MDL,* ECF No. 925 at 32); and/or

d.  As the MDL Court previously found, Defendants can "not demonstrate[] that they face 'constitutionally significant inconvenience' from participating in these actions, and the court's exercise of personal jurisdiction pursuant to Section 12 of the Clayton Act accordingly comports with the Fifth Amendment's Due Process Clause" (*BCBS MDL*, ECF No. 925 at 40); and/or

e.      As the MDL Court previously found, Defendants' conspiracy is analyzed

under the *per se* standard of review and this conspiracy, which all

Defendants entered, involved injury in the State of Alabama and "the overt

acts committed by BCBS-AL in furtherance of the alleged conspiracies

demonstrate a substantial connection between those conspiracies and

Alabama" (*BCBS MDL*, ECF No. 925 at 50); and/or

f.      Each Defendant has purposefully availed itself of the privilege of

conducting business activities within this District (and has the requisite

minimum contacts with the State of Alabama) because each Defendant

committed intentional acts that were intended to cause and did cause

injury within this District; and/or

g.      Each Defendant Insurance Company has purposefully availed itself of the

privilege of conducting business activities within this District (and has the

requisite minimum contacts with the State of Alabama); and/or

h.      Each Defendant Insurance Company has purposefully availed itself of the

privilege of conducting business activities within this District (and has the

requisite minimum contacts with the State of Alabama) because each

Defendant Insurance Company transacts business within this District by

processing and/or paying health care claims for services provided within

this District; and/or

i.      Each Defendant Insurance Company has purposefully availed itself of the

privilege of conducting business activities within this District (and has the

requisite minimum contacts with the State of Alabama) because each

> Defendant Insurance Company transacts business within this District by providing stop-loss insurance within this District; and/or

j.  One or more Plaintiffs have substantial presence within this District, including numerous employees, and each of the Defendants have adhered to and enforced an illegal agreement designed to cause harm to Plaintiffs within this District, including a joint agreement not to bid on Plaintiffs' business.

8.  For the same reasons explained above and as the MDL Court previously found (*see BCBS MDL*, ECF No. 925 at 59-62), venue is also proper in this District pursuant to §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391.

9.  This action also seeks to secure divisible and individualized injunctive relief against Defendants to prevent them from further harming Plaintiffs in violation of §§ 1 and 3 of the Sherman Act.  Plaintiffs are not seeking injunctive relief on behalf of anyone except themselves and do not seek any injunctive relief that infringes upon the Rule 23(b)(2) indivisible injunctive relief in the putative subscriber class action settlement in the MDL Court action.  The MDL Court has explained that "a Rule 23(b)(3) opt out reserves the right to pursue divisible relief including monetary relief and divisible injunctive relief."  *BCBS MDL*, ECF No. 2897.  As the MDL Court has further explained, "[t]he relief a Rule 23(b)(3) opt out may pursue is limited only to the extent that such relief may not infringe on the Rule 23(b)(2) indivisible injunctive relief approved by the court."  *Id.*

III.    **THE PARTIES**

**Plaintiffs**

   A.    **Bed Bath & Beyond**

   10.    Bed Bath & Beyond Inc. ("Bed Bath & Beyond") is a New York corporation with its principal place of business at 650 Liberty Avenue, Union, New Jersey 07083.  Bed Bath & Beyond is a retailer specializing in domestic merchandise.  In addition to online retail, as of May 2022, Bed Bath & Beyond operates 955 stores in all 50 states, the District of Columbia, Puerto Rico, and Canada.  For the fiscal year ended February 26, 2022, Bed Bath & Beyond had revenues of over $7 billion.

   11.    Bed Bath & Beyond together with its affiliates, provides its employees and their dependents with self-insured healthcare benefits through the Bed Bath & Beyond Inc. Employee Benefit Plan, (formerly known the Bed Bath & Beyond Inc. Employee Health Plan), which is based and administered from Union, New Jersey.  Since at least January 1, 2008 through the filing of this complaint, Bed Bath & Beyond has engaged Defendant Horizon Healthcare Services, Inc. d.b.a., Horizon Blue Cross Blue Shield of New Jersey to administer the plan through one or more ASO services contracts and amendments.

   12.    Bed Bath & Beyond paid more for health insurance services than it would have paid in a competitive market free from Defendants' agreement to not compete for National Accounts and has been injured by the Defendants' conduct as a result thereof.  Therefore, Bed Bath & Beyond purchased health insurance services, has been damaged by Defendants' conduct, and has a right to bring these claims.  Bed Bath & Beyond has standing and has sustained antitrust injury.

   13.    Bed Bath & Beyond submitted a valid and timely exclusion request and opted out of the Self-Funded Sub-Class of the proposed MDL subscriber 23(b)(3) Damages Class action.

**B.    AAA-SoCal**

14.    The Automobile Club of Southern California ("AAA-SoCal") is a California member club affiliated with the American Automobile Association (AAA) national federation, with its principal place of business at 3333 Fairvew Rd., A451, Costa Mesa, California 92626. AAA-SoCal offers membership, insurance, travel, discounts, financial, and automotive services to more than 7 million members.

15.    AAA-SoCal provides its employees and their dependents with self-insured healthcare benefits through the Automobile Club of California Flexible Benefits Plan, which is based and administered from Costa Mesa, California.  Since at least January 1, 2008 through the filing of this complaint, AAA-SoCal has engaged Defendant Anthem Blue Cross Life and Health Insurance Company to administer the plan through one or more ASO services contracts and amendments.

16.    AAA-SoCal has paid more for health insurance services than it would have paid in a competitive market free from Defendants' agreement to not compete for National Accounts and has been injured by the Defendants' conduct as a result thereof.  Therefore, AAA-SoCal purchased health insurance services, has been damaged by Defendants' conduct, and has a right to bring these claims.  AAA-SoCal has standing and has sustained antitrust injury.

17.    AAA-SoCal submitted a valid and timely exclusion request and opted out of the Self-Funded Sub-Class of the proposed MDL subscriber 23(b)(3) Damages Class action.

**C.    Darling**

18.    Darling Ingredients Inc. is a Delaware corporation with its principal place of business at 5601 N. MacArthur Blvd., Irving, Texas 75038.  Darling Ingredients Inc. is a developer and producer of products used by customers in the food, animal feed, fuel, bioenergy, and fertilizer industries.

19.     Griffin Industries, LLC, an affiliate of Darling Ingredients Inc., is a Kentucky limited liability company with its principal place of business at 5601 N. MacArthur Blvd., Irving, Texas 75038.  Griffin Industries, LLC is an affiliate of Darling Ingredients Inc. and is successor-in-interest to Griffin Industries, Inc.

20.     Darling Ingredients Inc., together with its affiliates, including Griffin Industries LLC ("Darling"), provides its employees and their dependents with self-insured healthcare benefits through Darling Ingredients Inc. Employee Benefits Plan (formerly known as the Griffin Industries, Inc. Self Insured Plan), which is based and administered in Irving, Texas.  Since at least January 1, 2008 through 2019, Darling has engaged Defendant Blue Cross Blue Shield of Texas, a Division of Health Care Service Corporation, a Mutual Legal Reserve Company, to administer the plan through one or more ASO services contracts and amendments.[4]

21.     Darling has paid more for health insurance services than it would have paid in a competitive market free from Defendants' agreement to not compete for National Accounts and has been injured by the Defendants' conduct as a result thereof.  Therefore, Darling purchased health insurance services, has been damaged by Defendants' conduct, and has a right to bring these claims.  Darling has standing and has sustained antitrust injury.

22.     Darling submitted a valid and timely exclusion request and opted out of the Self-Funded Sub-Class of the proposed MDL subscriber 23(b)(3) Damages Class action.

**D.     Dillard's**

23.     Dillard's, Inc. is a Delaware corporation with its principal place of business at 1600 Cantrell Rd. Little Rock, Arkansas 72201.  Dillard Store Services, Inc., a subsidiary of

---

[4]     From 2008-2011, Griffin Industries, Inc. contracted with Blue Cross Blue Shield of Texas to administer the plan.  Since 2012, through acquiring Griffin Industries, Inc., Darling Ingredients, Inc. contracted with Blue Cross Blue Shield of Texas.

Dillard's, Inc., is an Arizona corporation, with its principal place of business with its principal place of business at 1600 Cantrell Rd. Little Rock, Arkansas 72201.  Dillard's, Inc. ranks among the nation's largest fashion apparel, cosmetics and home furnishing retailers.  As of January 29, 2022, Dillard's Inc. operated 280 stores in addition to online retail.  For the fiscal year ending January 29, 2022, Dillard's Inc. reported revenue of over $6.5 billion.

24.     Dillard's, Inc., together with its affiliates including Dillard Store Services, Inc., ("Dillard's"), provides its employees and their dependents with self-insured healthcare benefits through the Dillard's Flexible Benefit Plan, which is based and administered from Little Rock, Arkansas.  Since at least January 1, 2008 through 2018, Dillard's has engaged Defendant Blue Cross Blue Shield of Texas, a Division of Health Care Service Corporation, a Mutual Legal Reserve Company, to administer the plan through one or more ASO services contracts and amendments.

25.     Dillard's has paid more for health insurance services than it would have paid in a competitive market free from Defendants' agreement to not compete for National Accounts and has been injured by the Defendants' conduct as a result thereof.  Therefore, Dillard's purchased health insurance services, has been damaged by Defendants' conduct, and has a right to bring these claims.  Dillard's has standing and has sustained antitrust injury.

26.     Dillard's submitted a valid and timely exclusion request and opted out of the Self-Funded Sub-Class of the proposed MDL subscriber 23(b)(3) Damages Class action.

**E.     Halliburton**

27.     Halliburton Energy Services, Inc., ("Halliburton") is a Delaware corporation with its principal place of business at 3000 North Sam Houston Pkwy East, Houston, Texas 77032-3219.  Halliburton is a subsidiary of the Haliburton Company, which is one of the world's largest providers of products and services to the energy industries.

28.    Halliburton provides its employees and their dependents with self-insured healthcare benefits through the Halliburton Energy Services, Inc. Welfare Benefits Plan and the Halliburton Energy Services, Inc. Retiree Medical Benefits Plan, which are based and administered from Houston, Texas.  Since at least January 1, 2008 through the filing of this complaint, Halliburton has engaged Defendant Blue Cross Blue Shield of Texas, a Division of Health Care Service Corporation, a Mutual Legal Reserve Company, and Blue Cross Blue Shield of Western New York to administer the plans through one or more ASO services contracts and amendments.

29.    Halliburton has paid more for health insurance services than it would have paid in a competitive market free from Defendants' agreement to not compete for National Accounts and has been injured by the Defendants' conduct as a result thereof.  Therefore, Halliburton purchased health insurance services, has been damaged by Defendants' conduct, and has a right to bring these claims.  Halliburton has standing and has sustained antitrust injury.

30.    Halliburton submitted a valid and timely exclusion request and opted out of the Self-Funded Sub-Class of the proposed MDL subscriber 23(b)(3) Damages Class action.

**F.    Kimberly-Clark**

31.    Kimberly-Clark Corporation ("Kimberly-Clark") is a Delaware corporation with its executive office at 351 Phelps Drive, Irving, Texas 75038.  Kimberly-Clark is a global company principally engaged in the manufacturing and marketing of a variety of personal care, consumer tissue, and K-C Professional products.  Kimberly-Clark's widely-known and highly-recognizable products are used by billions of people every year.  For the fiscal year ending December 31, 2021, Kimberly-Clark reported revenue of over $19 billion.

32.    Kimberly-Clark, together with its affiliates, provides its U.S.-based employees and their dependents with self-insured healthcare benefits through the Kimberly-Clark

Corporation Health & Welfare Benefit Plan, which is based and administered from Neenah, Wisconsin.  Since at least 2010 through the filing of this complaint, Kimberly-Clark has engaged Defendant Blue Cross Blue Shield of Georgia, Inc. and/or Blue Cross Blue Shield Healthcare Plan of Georgia, Inc., collectively d/b/a Anthem Blue Cross and Blue Shield to administer the plan through one or more ASO services contracts and amendments.

33.     Kimberly-Clark has paid more for health insurance services than it would have paid in a competitive market free from Defendants' agreement to not compete for National Accounts and has been injured by the Defendants' conduct as a result thereof.  Therefore, Kimberly-Clark purchased health insurance services, has been damaged by Defendants' conduct, and has a right to bring these claims.  Kimberly-Clark has standing and has sustained antitrust injury.

34.     Kimberly-Clark submitted a valid and timely exclusion request and opted out of the Self-Funded Sub-Class of the proposed MDL subscriber 23(b)(3) Damages Class action.

**G.     Lincoln**

35.     Lincoln National Corporation ("Lincoln") is an Indiana corporation with its principal place of business at 150 North Radnor-Chester Road, Radnor, Pennsylvania 19087. Lincoln is a holding company, which operates multiple insurance and retirement businesses through subsidiary companies.

36.     Lincoln, together with its affiliates, provides its employees and their dependents with self-insured healthcare benefits through   Lincoln National Corporation Employees' Life, Health and Accident Plan, The Lincoln National Life Insurance Company Agents' Life, Health & Accident Plan, Lincoln National Corporation Retired Employees' Life and Medical Plan, and The Lincoln National Life Insurance Company Retired Agents' Life and Medical Plan, which are based and administered from Radnor, Pennsylvania.  Since at least 2010 through January 1,

2022, Lincoln has engaged Defendant Independence Blue Cross Blue Shield to administer the plan through one or more ASO services contracts and amendments.

37.    Lincoln has paid more for health insurance services than it would have paid in a competitive market free from Defendants' agreement to not compete for National Accounts and has been injured by the Defendants' conduct as a result thereof.  Therefore, Lincoln purchased health insurance services, has been damaged by Defendants' conduct, and has a right to bring these claims.  Lincoln has standing and has sustained antitrust injury.

38.    Lincoln submitted a valid and timely exclusion request and opted out of the Self-Funded Sub-Class of the proposed MDL subscriber 23(b)(3) Damages Class action.

**H.    Live Nation**

39.    Live Nation Entertainment, Inc. ("Live Nation") is a Delaware corporation with its principal place of business at 9348 Civic Center Drive, Beverly Hills, California 90210.  Live Nation is the largest live entertainment company in the world, connecting over 310 million fans across all concerts and ticketing platforms in 45 countries in 2021 and over 580 million fans in 2019 prior to the global COVID-19 pandemic.

40.    Live Nation, together with its affiliates, provides its employees and their dependents with self-insured healthcare benefits through the Live Nation Entertainment, Inc Group Benefits Plan, which is based and administered from Beverly Hills, California.  Since at least 2008 through the filing of this complaint, Live Nation has engaged Defendant Anthem Blue Cross Life and Health Insurance Company to administer the plan through one or more ASO services contracts and amendments.

41.    Live Nation has paid more for health insurance services than it would have paid in a competitive market free from Defendants' agreement to not compete for National Accounts and has been injured by the Defendants' conduct as a result thereof.  Therefore, Live Nation

purchased health insurance services, has been damaged by Defendants' conduct, and has a right to bring these claims.  Live Nation has standing and has sustained antitrust injury.

42.     Live Nation submitted a valid and timely exclusion request and opted out of the Self-Funded Sub-Class of the proposed MDL subscriber 23(b)(3) Damages Class action.

**I.      Nestlé USA, Inc.**

43.     Nestlé USA, Inc. ("Nestlé USA") is a Delaware corporation with its principal place of business at 1812 N. Moore Street, Arlington, Virginia 22209.  Nestlé USA is the world's largest food and beverage company.

44.     Nestlé USA provides its employees and their dependents with self-insured healthcare benefits through the Nestlé USA Nescare Plan.  From 2010 and through 2015, Nestlé USA contracted with Defendant Anthem Blue Cross Life and Health Insurance Company to administer the plan through one or more ASO services contracts.  Since January 1, 2021 through the present day, Nestlé USA contracted with another party to the BCBSA license agreement  to administer the plan through one or more ASO services contracts.

45.     Nestlé USA has paid more for health insurance services than it would have paid in a competitive market free from Defendants' agreement to not compete for National Accounts and has been injured by the Defendants' conduct as a result thereof.  Therefore, Nestlé USA purchased health insurance services, has been damaged by Defendants' conduct, and has a right to bring these claims.  Nestlé USA has standing and has sustained antitrust injury.

46.     Nestlé USA submitted a valid and timely exclusion request and opted out of the Self-Funded Sub-Class of the proposed MDL subscriber 23(b)(3) Damages Class action.

**J.    Perdue Farms**

47.    Perdue Farms Inc. ("Perdue Farms") is a Maryland corporation with its principal place of business at 31149 Old Ocean City Road, Salisbury, Maryland 21804.  Perdue Farms, together with its affiliates, is a leading American chicken, turkey, and pork processing company.

48.    Perdue Farms provides its employees and their dependents with self-insured healthcare benefits through CareFirst of Maryland, Inc. dba CareFirst BlueCross BlueShield. Since January 1, 2017, Perdue Farms has engaged Defendant CareFirst of Maryland, Inc. to administer the plan through one or more ASO services contracts and amendments.

49.    Perdue Farms has paid more for health insurance services than it would have paid in a competitive market free from Defendants' agreement to not compete for National Accounts and has been injured by the Defendants' conduct as a result thereof.  Therefore, Perdue Farms purchased health insurance services, has been damaged by Defendants' conduct, and has a right to bring these claims.  Perdue Farms has standing and has sustained antitrust injury.

50.    Perdue Farms submitted a valid and timely exclusion request and opted out of the Self-Funded Sub-Class of the proposed MDL subscriber 23(b)(3) Damages Class action.

**K.    PG&E**

51.    Pacific Gas and Electric Company is a California corporation with its principal place of business at 77 Beale Street, San Francisco, California 94177.  Pacific Gas and Electric Company, together with its affiliates including PG&E Corporation ("PG&E"), is a public utility company operating in Northern and Central California.

52.    PG&E provides its employees and their dependents with self-insured healthcare benefits through:  PG&E's Anthem Health Account Medical Plan; PG&E's Anthem Blue Cross Network Access Plan (Anthem NAP) for Retirees/LTD U65; PG&E's Anthem Blue Cross Comprehensive Access Plan (Anthem CAP) for Retirees/LTD U65; PG&E's Anthem Blue Cross

Retiree Optional Plan (Anthem ROP) for Retirees/LTD U65; PG&E's Anthem CAP for

Retirees/LTD O65; PG&E's Anthem Blue Cross Medicare Supplemental Plan for Retirees/LTD

O65; and PG&E's Anthem ROP for Retirees/LTD O65.  Since at least January 1, 2008 through

the filing of this complaint, PG&E has engaged Defendant California Physicians' Service d/b/a

Blue Shield of California, including its affiliates, to administer the plans through one or more

ASO services contracts and amendments.

53.     PG&E has paid more for health insurance services than it would have paid in a

competitive market free from Defendants' agreement to not compete for National Accounts and

has been injured by the Defendants' conduct as a result thereof.  Therefore, PG&E purchased

health insurance services, has been damaged by Defendants' conduct, and has a right to bring

these claims.  PG&E has standing and has sustained antitrust injury.

54.     PG&E submitted a valid and timely exclusion request and opted out of the Self-

Funded Sub-Class of the proposed MDL subscriber 23(b)(3) Damages Class action.

**L.      Raytheon**

55.     Raytheon Technologies Corporation (formerly known as United Technologies

Corporation) is a Delaware corporation with its corporate headquarters at 1000 Wilson Blvd.,

Arlington, Virginia 22209.  Raytheon Technologies Corporation, together with its affiliates,

including Raytheon Company and Rockwell Collins, Inc., ("Raytheon"), is an aerospace and

defense company providing advanced systems and services for commercial, military, and

government customers worldwide.  In the fiscal year ending December 31, 2021, Raytheon

reported over $64 billion in revenue.

56.     Raytheon provides its employees and their dependents with self-insured

healthcare benefits through the Employee Group Health Plan of United Technologies

Corporation and the Group Health Plan of United Technologies Corporation, which are based

and administered from Farmington, Connecticut.  Since at least January 1, 2008 through the

filing of this complaint, Raytheon has engaged Defendant Anthem Health Plans, Inc. (doing

business as Anthem Blue Cross and Blue Shield) to administer the plans through one or more

ASO services contracts and amendments.

57.     Raytheon Company, a Raytheon subsidiary, provided its employees and their

dependents with self-insured healthcare benefits through the Raytheon Health Benefits Plan and

the Raytheon Retiree Health Benefits Plan, which were based and administered from Waltham,

Massachusetts.  Since at least January 1, 2008 through 2011, Raytheon Company engaged Blue

Cross Blue Shield of Massachusetts, Inc. to administer the plans through one or more ASO

services contracts and amendments.

58.     Rockwell Collins, Inc., a Raytheon subsidiary, provided its employees and their

dependents with self-insured healthcare benefits through the Rockwell Collins, Inc. Employee

Health Plan and the Rockwell Collins, Inc. Retiree Health Plan, which were based and

administered from Farmington, Connecticut. Since at least January 1, 2008 through 2019,

Rockwell Collins, Inc. engaged Wellmark Blue Cross Blue Shield of Iowa to administer the

plans through one or more ASO services contracts and amendments.

59.     Raytheon has paid more for health insurance services than it would have paid in a

competitive market free from Defendants' agreement to not compete for National Accounts and

has been injured by the Defendants' conduct as a result thereof.  Therefore, Raytheon purchased

health insurance services, has been damaged by Defendants' conduct, and has a right to bring

these claims.  Raytheon has standing and has sustained antitrust injury.

60.     Raytheon submitted a valid and timely exclusion request and opted out of the

Self-Funded Sub-Class of the proposed MDL subscriber 23(b)(3) Damages Class action.

**M.     Rite Aid**

61.     Rite Aid Corporation is a Delaware corporation with its principal place of business at 30 Hunter Lane, Camp Hill, Pennsylvania.  Rite Aid Corporation is a parent company to various subsidiaries, including Rite Aid Hdqtrs. Corp., some of which operate brick and mortar retail pharmacies.  Together, these entities are referred to as "Rite Aid."  In the fiscal year ending February 26, 2022, Rite Aid Corporation reported over $24.5 billion in revenue.

62.     Rite Aid provides its employees and their dependents with self-insured healthcare benefits through the Rite Aid Corporation Master Welfare Benefit Program, which is based and administered from Camp Hill, Pennsylvania.  Since at least April, 2011, through the filing of this complaint, Rite-Aid has engaged Defendant Highmark, Inc. at various times to administer the plan through one or more ASO services contracts and amendments.

63.     Rite Aid has paid more for health insurance services than it would have paid in a competitive market free from Defendants' agreement to not compete for National Accounts and has been injured by the Defendants' conduct as a result thereof.  Therefore, Rite Aid purchased health insurance services, has been damaged by Defendants' conduct, and has a right to bring these claims.  Rite Aid has standing and has sustained antitrust injury.

64.     Rite Aid submitted a valid and timely exclusion request and opted out of the Self-Funded Sub-Class of the proposed MDL subscriber 23(b)(3) Damages Class action.

**N.     Sterling Jewelers**

65.     Sterling Jewelers, Inc. is an Ohio corporation with its principal place of business at 375 Ghent Road, Akron, Ohio 44333.  Zale Corporation is a Delaware corporation with its principal place of business at 9797 Rombauer Road, Coppell, Texas 75019-5173.  Zale Delaware Inc. is a Delaware corporation with its principal place of business at 9797 Rombauer Road, Coppell, Texas 75019-5173.  Sterling Jewelers, Inc., together with its affiliates, including Zale

Corporation and Zale Delaware Inc. ("Sterling Jewelers"), is a global leading jewelry company. In the fiscal year ending January 29, 2022, Sterling Jewelers' parent company, Signet Jewelers Limited, reported over $7.8 billion in revenue.

66.     Sterling Jewelers provides its employees and their dependents with self-insured healthcare benefits through the Group Insurance Plan for Employees of Sterling Jewelers, Inc., which is based and administered from Akron, Ohio.  Since at least January 1, 2014 through December 31, 2019, Sterling Jewelers has engaged Defendant Community insurance Company (doing business as Anthem Blue Cross and Blue Shield) to administer the plan through one or more ASO services contracts and amendments.

67.     Sterling Jewelers has paid more for health insurance services than it would have paid in a competitive market free from Defendants' agreement to not compete for National Accounts and has been injured by the Defendants' conduct as a result thereof.  Therefore, Sterling Jewelers purchased health insurance services, has been damaged by Defendants' conduct, and has a right to bring these claims.  Sterling Jewelers has standing and has sustained antitrust injury.

68.     Sterling Jewelers submitted a valid and timely exclusion request and opted out of the Self-Funded Sub-Class of the proposed MDL subscriber 23(b)(3) Damages Class action.

**O.     Starbucks**

69.     Starbucks Corporation ("Starbucks") is a Washington corporation with its principal place of business at 2401 Utah Avenue South, Seattle, Washington 98134.  Starbucks, together with its affiliates, is the premier roaster, marketer, and retailer of specialty coffee in the world, operating in 80 countries.  In the fiscal year 2021, Starbucks reported over $29 billion in revenue.

70.     Starbucks provides its employees and their dependents with self-insured healthcare benefits through the Starbucks Corporation Welfare Benefits Program, which is based and administered from Seattle, Washington.  Since at least from October 2009 through September 2016, Starbucks engaged Defendant Premera Blue Cross to administer the plan through one or more ASO services contracts and amendments.

71.     Starbucks has paid more for health insurance services than it would have paid in a competitive market free from Defendants' agreement to not compete for National Accounts and has been injured by the Defendants' conduct as a result thereof.  Therefore, Starbucks purchased health insurance services, has been damaged by Defendants' conduct, and has a right to bring these claims.  Starbucks has standing and has sustained antitrust injury.

72.     Starbucks submitted a valid and timely exclusion request and opted out of the Self-Funded Sub-Class of the proposed MDL subscriber 23(b)(3) Damages Class action.

**P.      Tyson**

73.     Tyson Foods, Inc. ("Tyson") is a Delaware corporation with its principal place of business at 2200 West Don Tyson Parkway Springdale, Arkansas 72762-6999.  Tyson, together with its affiliates, is one of the world's largest food companies and a recognized leader in protein.  In the fiscal year ending October 2, 2021, Tyson reported over $47 billion in revenue.

74.     Tyson provides its employees and their dependents with self-insured healthcare benefits through the Tyson Foods, Inc. Group Health and Welfare Plan (Actives & COBRA), formerly known as the Tyson Foods, Inc. Group Health Plan (Actives & COBRA), which is based and administered from Springdale, Arkansas.  Since at least January 1, 2013 through 2020, Tyson has engaged Defendant BlueAdvantage Administrators of Arkansas, a division of Arkansas Blue Cross and Blue Shield, to administer the plan through one or more ASO services contracts and amendments.

75.     Tyson has paid more for health insurance services than it would have paid in a competitive market free from Defendants' agreement to not compete for National Accounts and has been injured by the Defendants' conduct as a result thereof.  Therefore, Tyson purchased health insurance services, has been damaged by Defendants' conduct, and has a right to bring these claims.  Tyson has standing and has sustained antitrust injury.

76.     Tyson submitted a valid and timely exclusion request and opted out of the Self-Funded Sub-Class of the proposed MDL subscriber 23(b)(3) Damages Class action.

**Defendants/Co-Conspirators**

77.     **BCBSA** is a not-for-profit corporation organized under the laws of the State of Illinois and headquartered in Chicago, Illinois.  It is owned and controlled by the Defendant Insurance Companies that use Blue Cross and Blue Shield trademarks and trade names.  BCBSA was created and maintained by these companies in furtherance of their unlawful conspiracy under the guise of licensing themselves the marks previously used by them.

78.     The principal headquarters for BCBSA is located at 225 North Michigan Avenue, Chicago, IL 60601.

79.     BCBSA has contacts with all 50 states, the District of Columbia, and Puerto Rico by virtue of its agreements and contacts with the individual Defendant Insurance Companies.  In particular, BCBSA has entered into agreements with Defendant Insurance Companies that control the geographic areas in which the individual Defendant Insurance Companies can compete.  These agreements and resulting conspiracy restrict output and allocates the market for ASO services to National Accounts on a nationwide basis in violation of §§ 1 and 3 of the Sherman Act (the "Blue conspiracy").

80.     Defendant Insurance Companies provide health insurance coverage for over 100 million—or one in three—Americans.  A Defendant Insurance Company is the largest health insurer, as measured by number of subscribers, in 44 states.

81.     **Anthem-California** ("Anthem-CA") has agreed to and participates in the Blue conspiracy using the Blue Cross trademark and trade name in California where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its allocated area.

82.     The principal headquarters for Anthem-CA is located at 21215 Burbank Blvd., Woodland Hills, California 91367.

83.     **Anthem-Colorado** ("Anthem-CO") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Colorado where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

84.     The principal headquarters for Anthem-CO is located at 700 Broadway, Denver, Colorado 80203.

85.     **Anthem-Connecticut** ("Anthem-CT") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Connecticut where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

86.     The principal headquarters for Anthem-CT is located at 370 Bassett Road, North Haven, Connecticut 06473.

87.     **Anthem-Empire** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Eastern and Southeastern New York where

it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its allocated area.

88.     The principal headquarters for Anthem-Empire is located at One Liberty Plaza, New York, New York 10006.

89.     **Anthem-Georgia** ("Anthem-GA") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Georgia where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

90.     The principal headquarters for Anthem-GA is located at 3350 Peachtree Road NE, Atlanta, Georgia 30326.

91.     **Anthem-Indiana** ("Anthem-IN") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Indiana where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

92.     The principal headquarters for Anthem-IN is located at 120 Monument Circle, Indianapolis, Indiana 46204.

93.     **Anthem-Kentucky** ("Anthem-KY") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Kentucky where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

94.     The principal headquarters for Anthem-KY is located at 13550 Triton Park Blvd., Louisville, Kentucky 40223.

95.     **Anthem-Maine** ("Anthem-ME") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Maine where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

96.     The principal headquarters for Anthem-ME is located at 2 Gannett Drive, South Portland, Maine 04016.

97.     **Anthem-Missouri** ("Anthem-MO") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Missouri, except for 32 counties in greater Kansas City and Northwest Missouri.  Anthem-MO is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area, which is defined as the state of Missouri, except the 32 counties in greater Kansas City and Northwest Missouri.

98.     The principal headquarters for Anthem-MO is located at 1831 Chestnut Street, St. Louis, Missouri 63103.

99.     **Anthem-New Hampshire** ("Anthem-NH") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in New Hampshire where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

100.    The principal headquarters for Anthem-NH is located at 3000 Goffs Falls Rd, Manchester, New Hampshire 03103.

101.    **Anthem-Nevada** ("Anthem-NV") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Nevada where it is

one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

102.   The principal headquarters for Anthem-NV is located at 9133 West Russell Rd. Suite 200, Las Vegas, Nevada 89148.

103.   **Anthem-Ohio** ("Anthem-OH") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Ohio where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

104.   The principal headquarters for Anthem-OH is located at 120 Monument Circle, Indianapolis, Indiana 46203.

105.   **Anthem-Virginia** ("Anthem-VA") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in most of Virginia, with the exception of a small portion of Northern Virginia in the Washington, DC suburbs. Anthem-VA is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area, which is defined as the state of Virginia, excepting a small portion of Northern Virginia in the Washington, DC suburbs.

106.   The principal headquarters for Anthem-VA is located at 2235 Staples Mill Road, Suite 401, Richmond, Virginia 23230.

107.   **Anthem-Wisconsin** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Wisconsin where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

108.     The principal headquarters for Anthem-WI is located at 120 Monument Circle, Indianapolis, Indiana 46204.

109.     **Elevance Health, Inc.** is the parent company of the Anthem Defendants. Through its subsidiaries, Elevance Health, Inc. has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in California, Colorado, Connecticut, New York, Georgia, Indiana, Kentucky, Maine, Missouri, New Hampshire, Nevada, Ohio, Virginia, and Wisconsin, where it is the largest or one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

110.     The principal headquarters for Elevance Health, Inc. is located at 220 Virginia Avenue, Indianapolis, Indiana 46204.

111.     **Aware** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Minnesota where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

112.     The principal headquarters for Aware is located at 3535 Blue Cross Road, St. Paul, Minnesota 55164.

113.     **BCBS-Alabama** ("BCBS-AL") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in the State of Alabama where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

114.     The principal headquarters for BCBS-AL is located at 450 Riverchase Parkway East, Birmingham, Alabama 35244.

115.     **BCBS-Arizona** ("BCBS-AZ") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Arizona where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

116.     The principal headquarters for BCBS-AZ is located at 2444 West Las Palmaritas Drive, Phoenix, Arizona 85021.

117.     **BCBS-Kansas City** ("BCBS-KC") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in the 32 counties of greater Kansas City and Northwest Missouri, plus Johnson and Wyandotte counties in Kansas. BCBS-KC is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area, which is defined as the 32 counties of greater Kansas City and Northwest Missouri, plus Johnson and Wyandotte counties in Kansas.

118.     The principal headquarters for BCBS-KC is located at 2301 Main Street, One Pershing Square, Kansas City, Missouri 64108.

119.     **BCBS-Kansas** ("BCBS-KS") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Kansas where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

120.     The principal headquarters for BCBS-KS is located at 1133 SW Topeka Boulevard, Topeka, Kansas 66629.

121.   **BCBS-Massachusetts** ("BCBS-MA") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Massachusetts where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

122.   The principal headquarters for BCBS-MA is located at 401 Park Drive, Boston, Massachusetts 02215.

123.   **BCBS-Michigan** ("BCBS-MI") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Michigan where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

124.   The principal headquarters for BCBS-MI is located at 600 E. Lafayette Blvd., Detroit, Michigan 48226.

125.   **BCBS-Mississippi** ("BCBS-MS") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Mississippi where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

126.   The principal headquarters for BCBS-MS is located at 3545 Lakeland Drive, Flowood, Mississippi 39232.

127.   **BCBS-North Carolina** ("BCBS-NC") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in North Carolina where it, like many other Defendant Insurance Companies in their allocated areas, is the largest

health insurer, as measured by number of subscribers, within its exclusive, protected service area.

128.    The principal headquarters for BCBS-NC is located at 5901 Chapel Hill Road, Durham, North Carolina 27707.

129.    **BCBS-New Jersey** ("BCBS-NJ") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in New Jersey where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

130.    The principal headquarters for BCBS-NJ is located at Three Penn Plaza East, Newark, New Jersey 07105.

131.    **BCBS-Rhode Island** ("BCBS-RI") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Rhode Island where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

132.    The principal headquarters for BCBS-RI is located at 500 Exchange Street, Providence, Rhode Island 02903.

133.    **BCBS-South Carolina** ("BCBS-SC") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in South Carolina where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

134.    The principal headquarters for BCBS-SC is located at 2501 Faraway Drive, Columbia, South Carolina 29212.

135.    **BCBS-Tennessee** ("BCBS-TN") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Tennessee where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

136.    The principal headquarters for BCBS-TN is located at 1 Cameron Hill Circle, Chattanooga, Tennessee 37402.

137.    **BCBS-Vermont** ("BCBS-VT") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Vermont where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

138.    The principal headquarters for BCBS-VT is located at 445 Industrial Lane, Berlin, Vermont 05602.

139.    **BCBS-Western New York** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Western New York where it is one of the largest health insurers, as measured by number of subscribers, within its allocated area, which is defined as Western New York State.

140.    The principal headquarters for BCBS-Western New York is located at 257 West Genesee Street, Buffalo, New York 14202.

141.    **BCBS-Wyoming** ("BCBS-WY") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Wyoming where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

142.    The principal headquarters for BCBS-WY is located at P.O. Box 2266, Cheyenne, Wyoming 82003.

143.    **California Physicians' Service** has agreed to and participates in the Blue conspiracy using Blue Shield trademark and trade name in California where it is one of the largest health insurers, as measured by number of subscribers, within its allocated area.

144.    The principal headquarters for California Physicians' Service is located at 50 Beale Street, San Francisco, California 94105-1808.

145.    **Cambia-Idaho** ("Cambia-ID") has agreed to and participates in the Blue conspiracy using Blue Shield trademark and trade name in Idaho where it is one of the largest health insurers, as measured by number of subscribers, within its allocated area.

146.    The principal headquarters for Cambia-ID is located at 1602 21st Ave, Lewiston, Idaho 83501.

147.    **Cambia-Oregon** ("Cambia-OR") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Oregon where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

148.    The principal headquarters for Cambia-OR is located at 100 SW Market Street, Portland, Oregon 97207.

149.    **Cambia-Utah** ("Cambia-UT") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Utah where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

150.    The principal headquarters for Cambia-UT is located at 2890 East Cottonwood Parkway, Salt Lake City, Utah 84121.

151.    **Cambia-Washington** ("Cambia-WA") has agreed to and participates in the Blue conspiracy using Blue Shield trademarks and trade names in Washington where it one of the largest health insurers, as measured by number of subscribers, within its allocated area.

152.    The principal headquarters for Cambia-WA is located at 1800 Ninth Avenue, Seattle, Washington 98111.

153.    **Capital** has agreed to and participates in the Blue conspiracy using the Blue Cross trademark and trade name in central Pennsylvania where it is one of the largest health insurers, as measured by number of subscribers, within its within its allocated area, which is defined as the 21 counties that make up central Pennsylvania:  Adams, Berks, Centre (Eastern portion), Columbia, Cumberland, Dauphin, Franklin, Fulton, Juniata, Lancaster, Lebanon, Lehigh, Mifflin, Montour, Northampton, Northumberland, Perry, Schuylkill, Snyder, Union, and York Counties.

154.    The principal headquarters for Capital is located at 2500 Elmerton Avenue, Harrisburg, Pennsylvania 17177.

155.    **CareFirst-DC** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Washington, DC and its suburbs where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

156.    The principal headquarters for CareFirst-DC is located at 10455 Mill Run Circle, Owings Mill, Maryland 21117.

157. **CareFirst-Maryland** ("CareFirst-MD") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Maryland where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

158. The principal headquarters for CareFirst-MD is located at 10455 and 10453 Mill Run Circle, Owings Mill, Maryland 21117.

159. **Excellus** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in central New York where it is one of the largest health insurers, as measured by number of subscribers, within its allocated area, which is defined as 31 counties in central New York.

160. The principal headquarters for Excellus is located at 165 Court Street, Rochester, New York 14647.

161. **GoodLife** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Nebraska where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

162. The principal headquarters for GoodLife is located at 1919 Aksarban Drive, Omaha, Nebraska 68180.

163. **GuideWell** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Florida where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

164.    The principal headquarters for GuideWell is located at 4800 Deerwood Campus Parkway, Jacksonville, Florida 32246.

165.    **Hawaii Medical** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Hawaii where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

166.    The principal headquarters for Hawaii Medical is located at 818 Keeaumoku Street, Honolulu, Hawai'i 96814.

167.    **HCSC-Illinois** ("HCSC-IL") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Illinois where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

168.    The principal headquarters for HCSC-IL is located at 300 E. Randolph Street, Chicago, Illinois 60601.

169.    **HCSC-Montana** ("HCSC-MT") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Montana where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area. Defendant Health Care Service Corporation acquired Blue Cross and Blue Shield of Montana in 2012.  Health Care Service Corporation has assumed liability for claims involving Blue Cross and Blue Shield of Montana prior to the 2012 acquisition.

170.    The principal headquarters for HCSC-MT is located at 560 N. Park Avenue, Helena, Montana 59604-4309.

171.   **HCSC-New Mexico** ("HCSC-NM") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in New Mexico where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

172.   The principal headquarters for HCSC-NM is located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, New Mexico 87113.

173.   **HCSC-Oklahoma** ("HCSC-OK") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Oklahoma where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

174.   The principal headquarters for HCSC-OK is located at 1400 South Boston, Tulsa, Oklahoma 74119.

175.   **HCSC-Texas** ("HCSC-TX") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Texas where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

176.   The principal headquarters for HCSC-TX is located at 1001 E. Lookout Drive, Richardson, Texas 75082.

177.   **Highmark-Delaware** ("Highmark-DE") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Delaware where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

178.    The principal headquarters for Highmark-DE is located at 800 Delaware Avenue, Wilmington, Delaware 19801.

179.    **Highmark Northeastern New York** has agreed to and participates in the Blue conspiracy using Blue Shield trademark and trade name in Northeastern New York where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area, which is defined as 13 counties in Northeastern New York.

180.    The principal headquarters for Highmark Northeastern New York is located at 257 West Genesee Street, Buffalo, New York 14202.

181.    **Highmark-Pennsylvania** ("Highmark-PA") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Western Pennsylvania and Blue Shield trademarks and trade names throughout the entire state of Pennsylvania.  Highmark-PA is the largest health insurer, as measured by number of subscribers, within its allocated area, which is defined as the 29 counties of Western Pennsylvania: Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Cameron, Centre (Western portion), Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Green, Huntingdon, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Somerset, Venango, Warren, Washington, and Westmoreland Counties.

182.    The principal headquarters for Highmark-PA is located at 120 Fifth Avenue Place, Pittsburgh, Pennsylvania 15222.

183.    **Highmark-West Virginia** ("Highmark-VA") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in West Virginia where it, like many other Defendant Insurance Companies in their allocated areas, is the largest

health insurer, as measured by number of subscribers, within its exclusive, protected service area.

184.    The principal headquarters for Highmark-WV is located at 700 Market Square, Parkersburg, West Virginia 26101.

185.    **Idaho Health** has agreed to and participates in the Blue conspiracy using the Blue Cross trademark and trade name in Idaho where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its allocated area.

186.    The principal headquarters for Idaho Health is located at 3000 East Pine Avenue, Meridian, Idaho 83642.

187.    **Independence** has agreed to and participates in the Blue conspiracy using the Blue Cross trademark and trade name in Southeastern Pennsylvania where it is the largest health insurer, as measured by number of subscribers, within its allocated area, which is defined as the 5 counties that make up Southeastern Pennsylvania:  Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties.

188.    The principal headquarters for Independence is located at 1901 Market Street, Philadelphia, Pennsylvania 19103.

189.    **Louisiana Health** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Louisiana where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

190.    The principal headquarters for Louisiana Health is located at 5525 Reitz Avenue, Baton Rouge, Louisiana 70809.

191.   **Noridian** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in North Dakota where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

192.   The principal headquarters for Noridian is located at 4510 13th Avenue South, Fargo, North Dakota 58121.

193.   **Premera-Alaska** ("Premera-AK") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Alaska where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

194.   The principal headquarters for Premera Blue Cross Blue Shield of Alaska is located at 2550 Denali Street, Suite 1404, Anchorage, Alaska 99503.

195.   **Premera-Washington** ("Premera-WA") has agreed to and participates in the Blue conspiracy using Blue Cross trademarks and trade names in the state of Washington where it is one of the largest health insurers, as measured by number of subscribers, within its allocated area.

196.   The principal headquarters for Premera Blue Cross is located at 7001 220th Street SW, Mountlake Terrace, Washington 98043-4000.

197.   **Triple-S** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Puerto Rico where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

198.   The principal headquarters for Triple-S is located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920.

199.   **USAble** has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Arkansas where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

200.   The principal headquarters for USAble is located at 601 S. Gaines Street, Little Rock, Arkansas 72201.

201.   **Wellmark-Iowa** ("Wellmark IA") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Iowa where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

202.   The principal headquarters for Wellmark-IA is located at 1331 Grand Avenue, Des Moines, Iowa 50306.

203.   **Wellmark-South Dakota** ("Wellmark SD") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in South Dakota where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

204.   The principal headquarters for Wellmark-SD is located at 1601 W. Madison, Sioux Falls, South Dakota 57104.

IV.   <u>**NATIONAL ACCOUNTS, ASO SERVICES, STOP-LOSS INSURANCE, AND THE RELEVANT MARKET**</u>

205.   The Defendant Insurance Companies offer a range of health insurance products to their customers.  Generally, these customers, depending on their size, use one of two types of health insurance for their employees and plan participants:  fully-insured or self-insured.  The

Defendant Insurance Companies sell insurance services to both fully-insured plans (typically to smaller employers) and to self-insured plans (typically offered by larger employers and plans). The Plaintiffs provide self-funded medical coverage and purchase administrative services only ("ASO") from the Defendant Insurance Companies.[5]  These plans are referred to as "ASO plans."  Some Plaintiffs purchase stop-loss insurance from the Defendants.

206.    The Defendant Insurance Companies and other health insurers and third-party administrators generally classify customers as "small group" or "large group" employers. Within the "large group" category, Defendant Insurance Companies and other insurance industry participants recognize large, multi-site employers or plans typically covering 5,000 or more employees as a distinct group that are referred to as "National Accounts."[6]  The sale of commercial health insurance services, including ASO services and stop-loss insurance, to National Accounts ("National Account Health Insurance Services") is recognized as a distinct economic market by the individual Defendant Insurance Companies and other health insurers, many of which have separate business units dedicated to National Accounts.  It is also recognized as a separate economic market by the consuming public, including the National Accounts themselves.  Sales of insurance services to National Accounts are not reasonably interchangeable with the sales of insurance services to smaller accounts and do not exhibit a high

---

[5]    Examples of National Account Health Insurance Services the Plaintiffs purchased from Defendants include:  access to provider networks and negotiated rates; claims adjudication; explanation of benefits (EOB); claims/membership inquiry management; member enrollment services; actuarial and statistical services; reporting services; internet interfacing for members and employers; disease/care management programs; prescription drug management programs; prior authorization services; nursing hotlines; telemedicine; stop-loss interfacing/reporting; wellness consulting and planning; HIPAA administration; maternity care services; case management and advocacy; managing ID cards and other member paperwork.

[6]    *See* footnote 1, *supra*.

degree of cross-elasticity of demand with such accounts.  This market is referred to herein as the "National Account Health Insurance Services" market.

207.    Insurance companies regularly bundle ASO services for self-insured National Accounts with stop-loss insurance.  Employers purchase stop-loss insurance to protect against the expense of paying unanticipated and unforeseen catastrophic healthcare costs.  Unlike health insurance where the insurer pays all of a health plan's healthcare costs, stop-loss insurance caps the healthcare liability of a self-insured employer.  Stop-loss insurance typically comes in two forms:  (1) "specific stop-loss" caps the healthcare liability of the employer for any one employee or dependent claimant, *e.g.*, the employer funds the healthcare plan for each claimant up to $100,000 and the insurance company covers any costs that exceed $100,000 for a given claimant; or (2) "aggregate stop-loss" caps the total healthcare liability for a self-insured employer across all claimants, *e.g.*, the employer is liable for total out-of-pocket healthcare costs up to $10,000,000, after which the stop-loss insurance provider covers any excess.

208.    Self-insured National Accounts often purchase both specific and aggregate stop-loss insurance products.  As a traditional insurance product, self-insured employers pay premiums for stop-loss insurance.  Because stop-loss insurance is regularly sold together with ASO services to National Accounts and National Accounts prefer the convenience of purchasing stop-loss insurance in connection with other ASO services, the package of ASO services that include the sale of stop-loss insurance is considered a distinct line of commerce and its inclusion in the National Account Health Insurance Services market is proper.  *See United States v. Grinnell Corp.*, 384 U.S. 563, 572-73 (1966); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 201 (D.D.C. 2017) (holding that traditional insurance for national accounts and ASO services for national accounts are part of the same market for evaluation under Clayton Act § 7).

209.    By virtue of their size and geographic dispersion, National Accounts have unique needs and characteristics that have led the health insurance industry to treat them as a separate economic category with distinct services and pricing.  Insurers identify and target National Accounts based on these attributes, and many other actors in the insurance space generally do not and cannot target National Accounts because of these attributes.  Accordingly, only the Defendant Insurance Companies, United HealthCare, Cigna, and Aetna are generally able to service the business of National Accounts.  Defendant Insurance Companies have a share of at least 50 percent of the National Account market.

210.    Virtually all National Accounts self-insure, which means they assume the risk and cost of covered medical services used by their covered individuals.  National Accounts facilitate this self-insurance coverage by purchasing ASO services pursuant to which third parties (such as Defendant Insurance Companies) manage the day-to-day administration of customers' health plans and grant the covered individuals access to their medical provider network(s).

211.    Payments for services from self-insured National Accounts to insurers under ASO contracts are known as "ASO fees."  ASO fees form a significant part of the negotiations between ASO service providers and National Accounts, but they are not the only source of revenue and profit for the ASO service provider.

212.    Competition between insurers for ASO National Account contracts allows employers, plan sponsors, plan administrators, trustees, and plans to obtain more favorable prices, provider networks, plan designs, and service levels.

213.    There is a relevant product market for the sale of commercial health insurance services to National Accounts with 5,000 members or more spread across two or more states. The relevant geographic market is the entire United States.  *See United States v. Anthem*, 236 F.

Supp. 3d 171, 193-202 (D.D.C. 2017) (finding that the relevant product market for consideration of the proposed Anthem/Cigna merger was the sale of commercial health insurance to National Accounts with 5,000 employees or more spread across two or more states). It is this relevant market made up of that product market and that geographic market that the unlawful conduct alleged herein has unreasonably injured.

214.    Plaintiffs are National Accounts as that term has been defined by the case law, and as it is commonly used in the insurance industry and by Defendant Insurance Companies. Plaintiffs self-insure and obtain National Account Health Insurance Services bids through requests for proposals and similar bidding processes and/or requests for competitive pricing ("RFPs") and enter into National Account Health Insurance Services contracts. Each Plaintiff entered into a new or renewal National Account Health Insurance Services contract or otherwise conducted negotiations and/or market reviews within the relevant time period. All have used RFPs or other competitive mechanisms for obtaining National Account Health Insurance Services for which the Defendant Insurance Companies have agreed among themselves to limit competition.

215.    As owners of the BCBSA, Defendant Insurance Companies, both among themselves and with the BCBSA, agreed to allocate customers and markets, restrict output, and eliminate the ability of Defendant Insurance Companies to compete against each other for the business of National Accounts. The illegal market or customer allocation and the output-reducing National Best Efforts Rule and Local Best Efforts Rule are enforced by the BCBSA through the BCBSA license and membership agreements. Under those agreements, any Defendant Insurance Company that competes against one of its co-conspirators to obtain the business of a National Account contrary to their agreement could lose its license to use the Blue

trade name and/or trademarks and would have to pay substantial penalties to the other Defendant Insurance Companies through the BCBSA.

216.    Pursuant to the Blue conspiracy, each of the individual Defendant Insurance Companies enters into a license agreement with BCBSA to use the Blue brand to sell commercial health insurance services in an "exclusive service area" (each, an "Allocated Territory").  Under the rules agreed to by Defendants, with certain limited exceptions, the Defendant Insurance Company allotted the Allocated Territory in which an employer or plan is headquartered is the only Defendant Insurance Company that is allowed to or will bid to provide insurance services to that employer or to other employers or plans located in the Allocated Territory.  Each Defendant Insurance Company also explicitly agrees in the BCBSA license agreement that it will not enter any territory allocated to another Defendant Insurance Company and compete against that Defendant by offering Blue-branded insurance services to any account that is headquartered in that territory.  Even in the limited areas where the Allocated Territory of two Defendant Insurance Companies overlap, all other Defendant Insurance Companies are prohibited from quoting employers or plans for insurance or ASO services headquartered in those areas.  These agreements, achieved through BCBSA Rules and BCBSA license agreements, are customer or territorial allocations among actual or potential horizontal competitors that are intended to prevent, and do, in fact, prevent, Defendant Insurance Companies from competing against each other by bidding for National Accounts headquartered outside of their Allocated Territory, including with respect to the National Account Health Insurance Services contracts.

217.    This elimination of competition has and continues to injure Plaintiffs by causing them to overpay for National Account Health Insurance Services.  Each time a Plaintiff has

sought bids for or sought to negotiate, renegotiate, or undertake a competitive market check of its ASO services contract, the Defendant Insurance Companies have individually and jointly refused to meaningfully compete for those contracts.  Defendant Insurance Companies routinely confirm their customer allocation agreement by continuing to participate in the BCBSA and adhering to and enforcing the BCBSA rules.  Their illegal conduct has damaged and continues to damage Plaintiffs (and other National Accounts) with regard to every RFP, negotiation, and/or market review process.

218.    Each of the Defendant Insurance Companies is an independent economic actor. Defendant Insurance Companies do not have common shareholders or ownership.  Each has its own sales, revenue, and costs and makes its own profits and losses, which only benefit its own shareholders or stakeholders.  Each Defendant Insurance Company is an actual or potential competitor of every other Defendant Insurance Company, as they all sell similar products and services and—but for the illegal acts alleged herein—could and would enter into each other's Allocated Territory to compete for the business therein, including the Plaintiffs' accounts.  As actual or potential competitors, each with its own profits and losses, the Defendant Insurance Companies, in the absence of the anticompetitive agreements alleged herein, each have an economic incentive to, and would, act as an independent center of economic decision-making. Each would compete against the other Defendant Insurance Companies for customers to increase its own sales and profits.  The anticompetitive agreements alleged herein deprive the relevant market of the independent and competitive centers of decision-making that are necessary to full and free competition.

219.    Many of the Defendant Insurance Companies have developed (or could develop) substantial non-Blue brands ("Green Competition") that could compete with the Blue-branded

products offered by Defendant Insurance Companies.  However, BCBSA rules limit the output

of Green Competition and restrict the ability of individual Defendant Insurance Companies to

compete both outside and inside of their Allocated Territory under non-Blue brands, *i.e.*, the

National Best Efforts Rule and the Local Best Efforts Rule.  But for the illegal agreements to

restrict output and allocate customers, the Defendant Insurance Companies could and would use

their Blue brands and non-Blue brands to compete with each other for the business of the

Plaintiffs, which would have resulted in greater competition and would have reduced prices paid

by the Plaintiffs for National Account Health Insurance Services.

220.    For example, as measured by total enrollment, Anthem is the largest health

insurer in the United States with approximately 45 million enrollees.  The Defendants have

allocated Anthem the geographic areas of all or part of 14 states.  Anthem also offers "green"

insurance throughout the U.S. through its non-Blue subsidiary, UniCare.  Anthem also operates

in a number of states outside of its Allocated Territory through its Medicaid subsidiary,

Amerigroup.  Because Anthem is already operating outside of its Allocated Territory via

UniCare and Amerigroup, Anthem could compete for National Accounts outside of its Allocated

Territory but for the illegal territorial restrictions and output limitations alleged herein.  Indeed,

Anthem acquired UniCare (through a merger with WellPoint) in 2004 to compete as a non-Blue

brand.  In 2006, however, Anthem froze UniCare expansion at the behest of and in agreement

with the other Defendants and by 2008 was considering selling UniCare to "[e]liminate[] source

of friction with other Blues."

221.    Health Care Service Corporation likewise operates in many states.  It has been

allotted the exclusive territories of Illinois, New Mexico, Oklahoma, Texas, and Montana.  It is

the largest mutual health insurance company and the fourth largest health insurance company in

the United States.  Health Care Service Corporation could and would compete for National Accounts outside of its Allocated Territory, but for the illegal territorial restraints and output restrictions alleged herein.

222.    Defendant Insurance Companies have a history of competing against each other in the few areas where such competition is not barred by the illegal horizontal agreements alleged herein.  For example, in Pennsylvania, when there were competing Blue Plans, one of the Defendants noted that competition resulted in "enormous downward pressure" on premium prices.

223.    The Antitrust Division of the Department of Justice defines a *per se* illegal allocation scheme as follows:  "allocation schemes are agreements in which competitors divide markets among themselves.  In such schemes, competing firms allocate specific customers or types of customers, products, or territories among themselves.  For example, one competitor will be allowed to sell to, or bid on contracts let by, certain customers or types of customers.  In return, he or she will not sell to, or bid on contracts let by, customers allocated to the other competitors.  In other schemes, competitors agree to sell only to customers in certain geographic areas and refuse to sell to, or quote intentionally high prices to, customers in geographic areas allocated to conspirator companies."

224.    By creating and enforcing the allocation of National Accounts and the other anti-competitive rules and agreements of the BCBSA, including the restrictive provisions of their respective license agreements with the BCBSA, Defendants have entered into *per se* illegal agreements in the National Account Health Insurance Services market.

225.    Defendant Insurance Companies exercise market power in the National Account Health Insurance Services market.  As of September 2015, Defendant Insurance Companies

served 85% of the Fortune 100 companies and 76% of Fortune 500 companies, a key indication of the market share and market power the Defendant Insurance Companies have in the relevant market for National Accounts.[7]  Collectively, the Defendant Insurance Companies control more than 50% of the relevant market.  Furthermore, the Defendant Insurance Companies have the ability to raise price significantly above the competitive level without losing so many sales as to make the price increase unprofitable.

226.    The elasticity of demand and cross-elasticity of demand is very low in the National Account market.  Large employers that provide health benefits to their employees have little choice other than to provide such benefits.  Accordingly, a small but significant non-transitory increase in the price of insurance services will not cause National Accounts to stop purchasing such services or switch to a close substitute.

227.    National Accounts have fewer insurance choices than other ASO plans, small employers, or individual insureds because only Defendant Insurance Companies along with United Healthcare, Cigna, and Aetna can service the vast majority of National Accounts.  Third Party Administrators ("TPAs") are not viable competitors for National Accounts and have at most a 1% presence in the National Account market.  Defendant Insurance Companies enjoy a market share of 2.5 to 3 times the share of any other competitor in the National Account market and, as alleged above, in excess of 50% of the relevant market.

228.    In litigation involving a prospective merger between Anthem and Cigna, the district court held that the merger was anticompetitive and illegal due to the market share and market power of Anthem in the National Account market, alone.  To this end, the court held that

---

[7]      Mark Farrah Associates, *Blue Cross and Blue Shield Market Share Snapshot 2015*, HEALTHCARE BUSINESS STRATEGY (Jan. 26, 2016), https://www.markfarrah.com/uploaded/mfa-briefs/Blue-Cross-and-Blue-Shield-Market-Share-Snapshot-2015.pdf

if Anthem were to increase its share of the market for National Accounts within Anthem's fourteen-state Allocated Territory from 40% to 48% the merger would presumably lessen competition because the market would be too concentrated.  Specifically, a market share increase from 40% to 48% would lead to a Herfindahl-Hirschmann Index ("HHI") concentration increase of 641 to 3124, a number well above the HHI of 2500 used as a baseline to determine a highly concentrated market.  *Anthem*, 236 F. Supp. 3d at 209.  The court held that the proposed merger was anticompetitive and illegal and rejected it.  *Id.* at 259.

229.    If reducing the number of competitors from 4 to 3 in the Anthem Allocated Territory was sufficient to make the Anthem/Cigna merger anticompetitive, then restricting competition among all the Defendant Insurance Companies to reduce the number of competitors for National Accounts from 37 to only 4 likewise increases market power and permits anticompetitive abuse.  Knowing that other competitors cannot bid for a National Account causes all the others to bid less aggressively.

230.    If the market allocation and/or output restrictions were eliminated, then Defendant Insurance Companies would also compete to a greater extent for National Accounts in the relevant market.  This would deconcentrate the relevant market because the Defendant Insurance Companies would exercise their newfound ability to bid on National Accounts in the Allocated Territory of other Defendant Insurance Companies.  Prices would drop and the market for National Accounts would become much more competitive as would be reflected in a significantly reduced HHI score.  Eliminating the anticompetitive conduct would also improve quality by allowing National Accounts to seek out those Defendant Insurance Companies with superior services.

231.    The Defendant Insurance Companies collectively use their market power to achieve anticompetitive results in the relevant market for National Accounts as is demonstrated by their ability to limit consumer choice, raise prices above the competitive level, and impose onerous terms on National Account purchasers, all without losing market share.

232.    At a minimum, Defendant Insurance Companies have exercised their collective market power in the relevant market for National Accounts to maintain that market power over National Accounts, even as their illegal and anticompetitive horizontal restraints limit output and restrict the choice of Plaintiffs to just one of the Defendant Insurance Companies in each Allocated Territory.

233.    The Defendant Insurance Companies have, at a minimum, profitably instituted a small but significant and non-transitory increase in the price the Defendant Insurance Companies charge for health insurance services to National Accounts without losing collective market share or causing their companies to be less profitable.

## V.    HISTORY OF THE DEFENDANT INSURANCE COMPANIES AND BCBSA

234.    The history of Blue Cross and Blue Shield demonstrates that the Defendant Insurance Companies arose independently and generically and used various Blue Cross and Blue Shield marks without the need for allocating the market or restricting output.  Only after years of consolidation and a desire to avoid competition amongst themselves did Defendant Insurance Companies and various predecessors conceive of coordinating the use of Blue Cross and Blue Shield marks in an effort to reduce competition with one another through market allocations and other output restrictions.

235.    BCBSA was created by the Defendant Insurance Companies; is entirely owned and controlled by them; and is the vehicle through which the Defendant Insurance Companies have combined and conspired in illegal restraint of competition.  Moreover, the history of

BCBSA demonstrates that the territorial and customer allocations in its purported trademark licenses facilitated a common plan to eliminate competition between the various Defendant Insurance Companies.

### A. Development of the Blue Cross Companies

236.    In 1934, an administrator named E.A. von Steenwyck helped develop a prepaid hospital plan in St. Paul, Minnesota.  In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform containing a blue Geneva cross and used the symbol and the name "Blue Cross" to identify the plan.  This is believed to be the first use of the Blue Cross symbol and name as a brand for a health care plan.  Within the year, other prepaid hospital plans began independently using the Blue Cross symbol.  The St. Paul plan did not try to prevent other plans from using the Blue Cross symbol or to monitor the quality of the services offered by other plans.  To the contrary, the St. Paul plan acquiesced in and even encouraged other plans to use the Blue Cross symbol even if those plans were in geographic areas that the St. Paul plan could reasonably expand.  The St. Paul plan allowed other competing hospital plans to use the Blue Cross symbol in every bordering state—North Dakota, South Dakota, Wisconsin, and Iowa— without objection.

237.    In 1937, Blue Cross plan executives met in Chicago.  At that meeting, American Hospital Association ("AHA") officials announced that prepaid hospital plans meeting certain standards of approval would receive institutional membership in the AHA.  In 1938, the AHA's Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans.  One such principle was that the plans would not compete with each other.  When the approval program went into effect, there were already 38 independently formed prepaid hospital plans with a total of 1,365,000 members.

238.     In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid hospital plans that received the approval of the AHA.

239.     In 1941, the Committee on Hospital Service, which had changed its name to the Hospital Service Plan Committee, introduced a new standard:  approval would be denied to any plan operating in another plan's service area.  Despite this, the independently formed prepaid hospital plans, now using the generic Blue Cross name, engaged in fierce competition with each other and often entered each other's territories regardless of the new standard.

240.     In 1947 and 1948 the AHA applied for and received a federal registration for the Blue Cross marks.  The AHA did this without procuring an assignment from the first user—the St. Paul Plan.

**B.**     **Development of the Blue Shield Plans**

241.     The development of what became the Blue Shield plans followed, and it largely imitated the development of the plans using the Blue Cross mark.  Blue Shield plans were designed to provide a mechanism for covering the cost of physician care—just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care.  Similar to the development of the Blue Cross hospital plans in conjunction with the AHA (which represents hospitals), the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

242.     Like the Blue Cross symbol, the Blue Shield symbol was developed by a local medical society plan, and it proliferated as other plans adopted it without the need for or obtaining any license.  The first use of the Blue Shield Service Mark was by the Western New York Plan in Buffalo, New York in 1939.  The Buffalo plan did not attempt to exclude other plans from using the Blue Shield service mark.  To the contrary, the Buffalo plan acquiesced in

the use of the mark by other plans and even encouraged other plans to use the Blue Shield mark; and, from 1939 to 1947, the Blue Shield marks were used by various medical plans.

243.    In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent plans that had been using the Blue Shield mark.  In 1947, the successor to the AMCP, the Blue Shield Medical Care Plans (the "National Organization"), formally adopted the Blue Shield mark as the mark of the association.  In 1950, the National Organization applied for federal registration of the Blue Shield mark.  In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

### C.    The Rise of Self-Funded Insurance

244.    In 1933, the New York state insurance commissioner determined that the early plans using the Blue Cross mark should be viewed as insurance because the plans collected premiums in advance and promised to provide care at some future date, not unlike life or casualty insurance.  *See*  Michael A. Morrissey, *History of Health Insurance in the United States*, HEALTH INSURANCE, at 7 (2d ed.2013) (hereinafter "Morrissey").

245.    Beginning in the 1940s, employers in the United States began to offer health insurance to their employees as a way of compensating employees at a time of wage and price controls during World War II.  Morrissey at 11.  The expansion of labor unions and favorable federal tax treatment further drove the growth of employer-sponsored health plans following the war.  *Id.* at 12-13.

246.    Originally, most employers purchased comprehensive commercial health insurance from healthcare insurance companies, such as Defendant Insurance Companies, but that changed after the passage of the Employee Retirement Income Security Act ("ERISA") in

1974.  Under ERISA, self-funded plans were not subject to state insurance regulations dealing with reserves or coverage requirements or to state premium taxes.  *Id.* at 16.

247.    ERISA had a profound impact on commercial health insurance plans purchased by large employers such that by 2021, 64 percent of insured workers were in a self-funded plan.[8]

### D.    Creation of the Blue Cross and Blue Shield Association

248.    Historically, the insurance companies using the Blue Cross and Blue Shield marks were fierce competitors.

249.    During the early decades of their existence, there were no restrictions on the ability of a plan using the Blue Cross or Blue Shield marks to compete with or offer coverage in an area already covered by another plan.  "Cross-on-Cross" and "Shield-on-Shield" competition also flourished.

250.    By the late 1940s, health insurance companies using a Blue mark faced growing competition not just from each other, but also from other insurance companies that had entered the market.  Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million.  While the insurance companies using the Blue marks remained dominant in most markets, this growth of competition was considered a threat.

251.    From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all plans using a Blue mark to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed.  One reason given for its failure was the AMA's fear that an unlawful restraint of trade action might result from such coordination.

---

[8]    *2021 Employer Health Benefits Survey*, KAISER FAMILY FOUNDATION (Nov. 10, 2021), https://www.kff.org/report-section/ehbs-2021-section-10-plan-funding/

252.     To counter the increasing competition, the Defendant Insurance Companies agreed to centralize the purported ownership of Blue marks that they had all used and which had become generic by that time.  In prior litigation, BCBSA has stated that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."  Of course, attempting to revive or register a mark for the purposes of violating Federal antitrust law invalidates the mark.

253.     In 1954, the insurance companies using Blue Cross marks agreed to transfer any purported rights that they might have in each of the respective trade names and trademarks to the AHA.  Yet, in many areas in the country, no Defendant Insurance Company ever owned exclusive common law rights that could be transferred to anyone.  In 1972, the AHA assigned its purported rights in these marks to the Blue Cross Association.  These assignments were contrary to public policy and done in furtherance of Defendants' conspiracy to violate the antitrust laws.

254.     Likewise, in 1952, the insurance companies using Blue Shield marks agreed to transfer any rights that they purported to have in the trade names and trademarks that they had all used and that had become generic by that time to the National Association of Blue Shield Plans, which in 1976 was renamed the Blue Shield Association.  As with the Blue Cross marks, in many areas in the country, no Defendant Insurance Company had ever owned exclusive common law rights that could be transferred to anyone.

255.     During the 1970s, Defendant Insurance Companies began merging with their competitors, including other BCBS companies, all over the U.S. By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were meeting four times a year.  In 1978, the Blue Cross Association and the National

Association of Blue Shield Plans (which was then called the Blue Shield Association) consolidated their staffs, although they retained separate boards of directors.

256.    In his annual report to the associations given in 1979, President Walter J. McNerney called for further "coordinated action."[9]

257.    This "coordinated action" raised antitrust concerns.  In 1980, when the two associations were considering a joint National Government Market Strategy, it was noted that "[t]here is a continuing uneasiness among a number of us in the system regarding the antitrust aspects of what is being proposed, as well as the manner in which it is being considered."

258.    In 1982, the Blue Cross Association and the Blue Shield Association merged to form the Defendant, BCBSA.  At that time, BCBSA became the sole owner of the putative Blue Cross and Blue Shield trademarks and trade names that purportedly had previously been transferred by Defendant Insurance Companies and their predecessor-competitors with whom they had merged or acquired.

259.    To provide "checks and balances" against "open competition," the members of the Blue conspiracy presented at the 1982 annual meeting a "Long-Term Business Strategy."  At this meeting, the co-conspirators adopted several recommendations contained in the Long-Term Business Strategy, including Proposition 1.2, described below, which provided that there would be only one co-conspirator per state.

260.    In November 1982, after heated debate, BCBSA's member plans agreed to and promulgated two BCBSA "propositions" (Proposition Nos. 1.1 and 1.2):  (1.1) by the end of

---

[9]    *See* Defendant Blue Cross Blue Shield Association's Answer to the Subscriber Track's Third Amended Consol. Class Action Complaint ¶ 487, p. 176, *In re Blue Cross Blue Shield Antitrust Litigation MDL 2406*, No. 2:13-cv-20000-RDP (N.D. Ala. May 17, 2017), ECF No. 1166.

1984, all existing insurance companies using a Blue mark would consolidate at a local level to form Blue Cross and Blue Shield plans; and (1.2) by the end of 1985, all insurance companies using a Blue mark within a state would further consolidate, ensuring that each state would have only one BCBS competitor.  Proposition 1.2 was justified as "a concentration of power and resources to allow us to maximize our effectiveness on all matters in which the several corporations should act collectively," including "decision-making" and "policy determination." As a result of these propositions, the number of insurance companies using the Blue mark declined sharply from 114 in 1980, to 77 in 1990, and now less than half that amount.

261.     Even consolidation, however, did not end all competition between the coordinating insurance companies.

262.     In the early 1980s, for example, multiple insurance companies using Blue marks competed head-to-head in parts of New York.

263.     From 1981 to 1986, the Defendant Insurance Companies lost market share of the market for the sale of healthcare insurance (both individual and group) to other healthcare insurance carriers (including other Defendant Insurance Companies competing under their non-Blue brands) at a rate of approximately one percent per year.  At the same time, the amount of competition among Defendant Insurance Companies, including their subsidiaries operating without a Blue mark, increased substantially.

264.     In April 1987, the member plans of BCBSA held an "Assembly of Plans"—a series of meetings held for the purpose of determining how they would and would not compete against each other.  During these meetings, these independent economic actors/health insurers and competitors agreed to recognize and maintain exclusive Allocated Territories when using the Blue brand, thereby eliminating "Blue on Blue" competition.

265.    However, the 1987 Assembly of Plans did not restrain competition by non-Blue branded plans of Defendant Insurance Companies—an increasing "problem" that caused complaints from many Defendant Insurance Companies.

266.    After the 1986 revocation of the Defendant Insurance Companies' tax-exempt status and throughout the 1990s, the number of non-Blue branded plans of Defendant Insurance Companies increased.

267.    These plans continued to compete with Blue-branded plans.

268.    As a result, the member/owners of BCBSA discussed ways to rein in the non-Blue branded output and resulting competition that was thwarting their market allocation scheme.

269.    In 1996, after recommendations by a Special Committee of the BCBSA, the Defendant Insurance Companies voted to modify the BCBSA rules to which the BCBSA's members were subject by inserting a local "best efforts" requirement into the service mark licensing agreement that every Defendant Insurance Company entered into with the BCBSA. The new requirement, which was agreed to by all of the Defendant Insurance Companies, reads as follows:  "[a]t least 80% of the annual Combined Local Net Revenue of a controlled affiliate attributable to health care plans and related services ... offered within the designated Service Area must be sold, marketed, administered or underwritten under the Licensed Marks and Names."

270.    The Defendant Insurance Companies also adopted and agreed to a restraint that required any Defendant Insurance Company that departed from BCBSA to pay an exit fee.

271.    The Defendant Insurance Companies also limited transfer rights by requiring prior BCBSA review and facilitation of the establishment of a successor Blue Licensee.

272.     Defendant Insurance Companies then turned their attention to a national "best efforts" requirement.  A 51% national best efforts proposal, requiring that 51% of a Defendant Insurance Company's revenues come from the sale of Blue-branded services, was voted down in 2001.  But an even more restrictive rule was proposed and presented in 2004 and later accepted and agreed to by the Defendant Insurance Companies and the BCBSA.  This National Best Efforts Rule is embodied in the following unlawful rule:  "[a]t least 66-2/3% of the annual Combined National Net Revenue of the Controlled Affiliate[] attributable to health care plans and related services … must be sold, marketed, administered or underwritten under the Licensed Marks and Names.  The percentage set forth in this paragraph shall not be changed for at least 10 years from the date of adoption of this paragraph."  After these ten years expired (and during the relevant time period), the Defendant Insurance Companies agreed that the National Best Efforts Rule would be continued.

273.     The Defendant Insurance Companies and the BCBSA also enacted and agreed to anticompetitive restraints regarding the allocation of National Accounts amongst Defendant Insurance Companies.  In a further effort to monetize their unlawful customer allocation, Defendant Insurance Companies agreed through the BCBSA that they could sell their exclusive territorial rights to provide services to purchasers headquartered in their allocated territory through a process known as ceding, whereby one Defendant Insurance Company can sell to another Defendant Insurance Company the right to contact, sell to, and service the members of a National Account headquartered in its Allocated Territory for a price.  In other words, a Defendant Insurance Company could sell a National Account to one and only one other Defendant Insurance Company the exclusive right to bid on the account, thereby ensuring that

any National Account within any particular Defendant Insurance Company's Allocated Territory would have no more than one Defendant Insurance Company bid for its business.

274.     The Defendant Insurance Companies did not need these restraints to service National Accounts.  The Defendant Insurance Companies could have serviced National Accounts without conspiring to restrict competition and limit output.  In fact, prior to 2005, when the National Best Efforts Rule was adopted by the BCBSA, the Defendant Insurance Companies did provide insurance services to National Accounts without the (anticompetitive) use of the National Best Efforts Rule.

275.     The fact of ceding—whereby a Defendant Insurance Company sold its right to bid on a National Account within its Allocated Territory to another Defendant Insurance Company— demonstrates that the restraints are not necessary to service National Accounts.

276.     The restraints are not ancillary to any pro-competitive agreement among the Defendant Insurance Companies and are unnecessary to effectuate any pro-competitive purposes.

277.     Allocated Territories and customers are not necessary to serve National Accounts and any such purported necessity provides no justification for the allocation of National Account customers.  When an Insurance Company Defendant services a National Account, it is already operating outside of its Allocated Territory.

278.     Defendants use the Allocated Territories as a means to implement their customer allocation by dividing up National Accounts based upon the Allocated Territory in which the account is headquartered.  Yet, Defendants could just as easily—and unlawfully—allocate them based on where a National Account has the most covered lives or where it is incorporated.  Likewise, Defendants could achieve their same (unlawful) objective by allocating national accounts alphabetically or by random draw.  There is nothing inherent about Defendants'

allocation of National Accounts that requires the Allocated Territories nor does the continuation of the Allocated Areas require the allocation of National Accounts.[10]

## VI.   CONTROL OF BCBSA BY DEFENDANT INSURANCE COMPANIES

279.   On its website, BCBSA calls itself "a national association of 36 independent, community-based and locally operated Blue Cross and Blue Shield companies." It "grants licenses to independent companies to use the trademarks and names in exclusive geographic areas." The trademarks and trade names are the Blue Cross and Blue Shield trademarks, trade names and logos.

280.   The Defendant Insurance Companies are the members and owners of BCBSA and collectively control and govern every aspect of BCBSA, including its rules and the terms of the license agreements that the association enters into with its members. Each of the Defendant Insurance Companies agrees with each other and with the BCBSA to adhere to the rules, regulations, and bylaws promulgated by the jointly owned and controlled association.

281.   The Defendant Insurance Companies are all independent health insurance companies that could and would compete with one another in the absence of the unlawful agreements alleged herein. To prevent such competition, Defendant Insurance Companies use the collective control they purport to have over certain Blue marks and names that they then license to the Defendant Insurance Companies on terms that the Defendants collectively agree upon. The BCBSA is not a single entity but is instead a combination or conspiracy composed of

---

[10]   For this reason, if Defendants' geographic allocation is illegal, then so too is the National Account allocation. But if the Allocated Territories are deemed lawful or subject to a standard other than *per se* analysis, then it does not follow that the National Account allocation is lawful or subject to any standard other than *per se*.

the Defendant Insurance Companies.  The BCBSA's Board of Directors is comprised of one member from each of the Defendant Insurance Companies, plus the CEO of BCBSA.

282.     As one federal court has recognized, BCBSA "is owned and controlled by the member plans."  *Central Benefits Mut. Ins. Co. v. Blue Cross & Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).  Accordingly, BCBSA lacks the characteristics of a single entity and is instead a cartel of competitors.

283.     The MDL Court has held that the undisputed evidence shows that "the Blue Plans are 36 independent companies," each of which sells health insurance services; that each plan is "autonomous in its operations" and a "financially independent entit[y]" with its own profits and losses; and that Defendants are not "partners or joint ventures."  *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1250 (N.D. Ala. 2018).  In other words, each Defendant is a separate economic actor pursuing separate economic interests.

284.     The Rules of the BCBSA are determined by a three-quarters weighted vote of its members and "each member Plan has agreed to be bound by the Association Rules."  *Id.*  The MDL Court found that "the undisputed record evidence also reveals that the Blue Plans control the terms of each Blue's License Agreement" and that the Defendant Insurance Companies "vote on and approve amendments to the licensing agreements."  *Id.* at 1267.  The MDL Court further found that each Defendant Insurance Company has entered into a license agreement with the collectively controlled BCBSA.  *Id.* at 1251.  In each of those license agreements, the BCBSA grants to each Defendant Insurance Company "an exclusive 'service area' where a Member Plan may use the Blue Marks" and, critically, each member is required to agree with collectively controlled and owned BCBSA that "it may not use the licensed Marks and Name outside the service area."  *Id.*

285.     The determination of where an individual Defendant Insurance Company will compete using a Blue mark and in what areas it will refrain from competing is not left to the "independent decision-making" of each licensee or to the independent decision-making of a holder of common-law trademark rights.  To the contrary, it is the BCBSA that is composed of 36 separate economic entities, each with its own interest in preventing other members from directly competing with it, that formulated the rules that govern where and with whom each Defendant Insurance Company can compete.  Clearly, each Defendant Insurance Company is a separate economic actor with its own economic interests to pursue who, by joining together with the BCBSA, collectively decides how and where the licensees will compete and have deprived the marketplace of the independent centers of decision-making that competition requires.  As a result, Defendants do not, as a matter of law, qualify for single-entity treatment.

286.     The Government Accountability Office ("GAO") issued a detailed report on the operations of BCBSA in 1994 that was prepared with the cooperation of the association.[11]  The GAO's report described the governance structure of BCBSA as follows:

> As members of the Association, Blues plans collectively govern the Association's affairs pursuant to written bylaws.  Under these bylaws, the Association is governed by a board of directors.  The board of directors consists of the CEOs of most plans and the Association president.  Plan representatives to the membership meetings may or may not be the plan CEO.  For practical purposes, meetings of the Association's board of directors and its membership comprise largely the same individuals.[12]

287.     Thus, the Defendant Insurance Companies control the Board of Directors of BCBSA.

---

[11]     Government Accountability Office, "Blue Cross and Blue Shield: Experiences of Weak Plans Underscore the Role of Effective State Oversight," Apr. 1994 ("GAO Report"), at 24, http://archive.gao.gov/t2pbat3/151562.pdf.

[12]     *Id.* at 24-25.

288.     In a pleading it filed during litigation in the Northern District of Illinois, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer."

289.     The current chairman of the Board of Directors, Tim Vines, is also the president and chief executive officer of Blue Cross and Blue Shield of Alabama.  Mr. Vines assumed leadership in November 2021, from David L. Holmberg, who previously served as chair of the Board while also serving as the President and CEO of defendant Highmark Health, which describes itself as:

> an $18 billion blended health organization that includes one of America's largest Blue Cross Blue Shield insurers and a growing regional hospital and physician network.  Based in Pittsburgh, PA, Highmark Health's 35,000 employees serve millions of customers nationwide through the nonprofit organization's affiliated businesses, including Highmark Inc., Allegheny Health Network, HM Insurance Group, United Concordia Dental, and Helion.

290.     The Board of Directors of BCBSA meets at least quarterly.

291.     The Board of Directors—comprised of Defendant Insurance Company executives—possess the authority to amend or add rules, regulations, bylaws, and restraints on competition.

292.     The governance structure of the Association is set out in its bylaws, which were approved by a vote of the Defendant Insurance Companies.

293.     Defendant Insurance Companies may amend or repeal the bylaws and adopt new bylaws.  Likewise, they may revoke and return at any time the purported ownership of any marks or trade names registered to BCBSA.

294.     The GAO Report also described the voting process used by the BCBSA:

> Decisions on significant issues relevant to all plans are generally decided by a vote of the Association membership.  Examples of significant issues include the termination of a plan's membership license or the amendment of the Association's bylaws.  The membership voting process combines a straight vote—one member,

one vote—and a weighted vote.  Under weighted voting, each member plan is entitled to one vote for each $1,000 of annual dues it pays to the Association.  Because dues are based on plan premium volume, the larger plans receive a greater number of weighted votes than smaller plans.

For a membership vote to pass, the bylaws generally require a majority of both the straight and weighted votes of the members.  However, this rule has exceptions.  For example, the termination of a plan's trademark license requires at least three-fourths of the straight vote and three-fourths of the weighted vote rather than a simple majority.  An amendment to the Association bylaws, on the other hand, requires one-half of the straight vote and two-thirds of the weighted vote.[13]

## VII.   LICENSE AGREEMENTS AND RESTRAINTS ON COMPETITION

295.   As described above, BCBSA requires each of Defendant Insurance Company to execute a purported license agreement with respect to its use of Blue service marks or trade names.

296.   The GAO Report says that:

To use the Blue Cross and Blue Shield names and trademarks, each Blues plan must sign a license agreement with the Association.  The agreement does not constitute a partnership or joint venture, and the Association has no obligations for the debts of member plans.

The license agreement restricts plans from using the trademark outside their prescribed service area to prevent competition among plans using the Blue Cross and Blue Shield names and trademarks.[14]

The "prescribed service area" is the "Allocated Territory" described above.

297.   This collective enforcement of trademark "rights" is not the equivalent of individual enforcement of common-law trademark rights.  Common-law trademark rights give the holder the ability to exclude others from using the mark within a given territory.  Defendant Insurance Companies, however, have gone far beyond granting that ability to each other.  Defendants collectively through the BCBSA also extract a promise from each other that it will

---

[13]   *Id.* at 25-26.

[14]   *Id.* at 28.

not venture beyond its borders and compete against other Defendant Insurance Companies outside of its territory.  308 F. Supp. 3d at 1269.  Each Defendant Insurance Company even agreed with the group that it could be fined or lose its rights altogether if it tried to break out of its territory and compete against another Defendant.  *Id.*  In other words, Defendant Insurance Companies agreed that each Allocated Territory would not only be an exclusive territory, but also a cage—beyond which the Defendant Insurance Company agreed with all the other Defendants it would not venture.  There are no comparable common-law trademark rights that allow a horizontal group of competitors to agree that none of them will go beyond their territory to compete against each other.  Thus, the BCBSA does not merely enforce previously owned individual common-law trademark rights.  It organizes a horizontal group promise that confines each licensee to provide services only to entities that happen to be located in its own territory.

298.    An individual common-law trademark holder can decide on its own to enforce (or not enforce) its common-law trademark rights, but it is precisely the abandonment of that individual decision-making in favor of collective decision-making by a group of competitors that becomes a horizontal agreement among competitors within the meaning of §§ 1 and 3 of the Sherman Act.  Such a horizontal agreement that allocates territories among competitors using the same trademark is a *per se* violation of §§ 1 and 3 of the Sherman Act.

299.    Defendant Insurance Companies as a group through the BCBSA have decided by a 75% weighted vote (1) who will be allowed to use the Blue marks in exclusive territories and (2) that each Defendant must promise not to conduct business by using the BCBS marks and trade names beyond its own Allocated Territory.

300.    If each individual Defendant Insurance Company still had its hypothesized common-law trademark rights, each one of them would independently decide for itself whether

to enforce or not enforce those common-law rights.  Just as actually happened, two insurance companies, each with an exclusive Blue territory, could enter each other's Allocated Territory, but each independently decide not to object to the competition or to file suit.  308 F. Supp. 3d at 1253.  Each might be happy to let the other into its territory so long as it could expand beyond its own borders.  Different Defendant Insurance Companies exercising these purported individual common-law rights could make different independent decisions—some more aggressive, some less so.  Different settlements between them could be struck, or the parties could pursue the dispute to a judicial conclusion and the asserted trademark and trade name rights could be found invalid or not infringed.  All of these events would be determined by separate economic entities, each making its own independent decisions to best serve their individual economic interest.  Defendants, however, through their collective control of the BCBSA have eliminated that individual decision-making and replaced it with group decision-making through the BCBSA.  Defendants' conduct is not the codifying of individually owned common-law rights.  It is the transfer of those rights to a collectively controlled horizontal group which eliminates the independent decision-making by competitors that is the essence of market competition.

As the foregoing demonstrates and as set forth in detail below, BCBSA is a vehicle used by independent health insurance companies to enter into horizontal agreements that restrain competition.

## VIII.   THE HORIZONTAL AGREEMENTS NOT TO COMPETE

301.    Each Defendant Insurance Company listed herein is an independent legal entity.

302.    No Defendant Insurance Company has or had any franchise agreement with another Defendant Insurance Company.

303.    No Defendant Insurance Company has or had any franchise agreement with BCBSA.

304.    The restraints and regulations of BCBSA, including, but not limited to, the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines"), constitute horizontal agreements between competitors, Defendant Insurance Companies, to limit output and divide the geographic market for commercial healthcare insurance in the United States.  As such, they are *per se* violations of §§ 1 and 3 of the Sherman Act.

305.    BCBSA is a vehicle used by independent health insurance companies to enter into horizontal agreements that restrain competition.  Because BCBSA is owned and controlled by the Defendant Insurance Companies, any agreement between BCBSA and a Defendant Insurance Company constitutes a horizontal agreement between and among the Defendant Insurance Companies themselves.  As two economists told the FTC, "[t]he Blues collude almost perfectly. Blue Cross and Blue Shield plans agree upon geographical market areas with the assistance of their national associations."[15] This collusion later became even more pernicious with the advent of Allocated Territories and the "best efforts" requirements outlined above.  As one legal scholar (Mark Hal of Wake Forest Law School) noted recently when referring to the structure of BCBSA and the various restraints at issue here, "[i]t's sort of antitrust law 101 that direct competitors can't agree to divvy up their territory."[16]

---

[15]    *Competition in the Health Care Sector: Past, Present, and Future*, FEDERAL TRADE COMMISSION, 212 (Mar. 1978), https://www.ftc.gov/sites/default/files/documents/reports/competition-health-care-sector-past-present-and-future-proceedings-conference/197803healthcare.pdf

[16]    Anna Wilde Mathews, *Antitrust Lawsuits Target Blue Cross Blue Shield*, THE WALL STREET JOURNAL (May 27, 2016), https://www.wsj.com/articles/antitrust-lawsuits-target-blue-cross-and-blue-shield-1432750106

306. The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans." Under the terms of the License Agreements, each Defendant Insurance Company "agrees . . . to comply with the Membership Standards."[17]

307. The Guidelines state that the Membership Standards and the Guidelines "were developed by the Plan Performance and Financial Standards Committee (PPFSC) and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994"; that the Membership Standards "remain in effect until otherwise amended by the Member Plans"; that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote"; that "new or revised guidelines shall not become effective . . . unless and until the Board of Directors approves them"; and that the "PPFSC routinely reviews" the Membership Standards and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."[18]

308. Defendants have divided the National Account market into Allocated Territories assigned exclusively to distinct Defendant Insurance Companies such that only one of them can bid on any particular National Account. Through the License Agreements, Guidelines, and Membership Standards, which the Defendant Insurance Companies created, control, and enforce, each Defendant Insurance Company agrees that neither it nor its subsidiaries will compete under Blue Cross and Blue Shield marks or names outside of a designated Allocated Territory. The restraints and regulations imposed "by" the BCBSA on the Defendant Insurance Companies are actually anticompetitive restraints and regulations negotiated by, and agreed to, by and amongst

---

[17]    *See* Def. Blue Cross and Blue Shield Association's Answer and Affirmative Defenses to Corrected Consol. Second Amended Provider Compl. at ¶ 156, *BCBS MDL*, ECF No. 289.

[18]    *Id.* at ¶ 157.

the Defendant Insurance Companies—all of which are or would be horizontal competitors but for the anticompetitive agreements alleged herein.

309.    The License Agreement defines each Defendant Insurance Company's Allocated Territory as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."  The Association has a "Map Book" which memorializes the Defendant Insurance Companies' defined service areas.  Under the License Agreements, subject to certain exceptions related to National Accounts and Government Programs, Defendant Insurance Companies agreed that a "Plan may not use the Licensed Marks and Name outside the Service Area . . . ."  These Map Books are not public record.  They are considered by the Association to be "highly sensitive" and are distributed only to a limited number of employees.

310.    Each Defendant Insurance Company entered into a License Agreement with BCBSA.

311.    All Defendants have enforced the Allocated Territories provided by the License Agreement.

312.    The Defendant Insurance Companies police the compliance of each other with the restraints and regulations of BCBSA.

313.    The Defendant Insurance Companies control and administer the disciplinary process for any Defendant Insurance Company that does not abide by BCBSA's restraints and regulations.

314.    The Defendant Insurance Companies control the termination of each other from BCBSA, including the loss of the putative "license" to use the Blue marks and trade name.

315.     The Defendant Insurance Companies have abided by the Allocated Territories and have refused to compete against each other to provide Blue-branded commercial healthcare insurance to National Accounts.

316.     In addition to allocating geographic markets through their use of Allocated Territories, Defendants have developed additional rules which place added restraints on the Defendant Insurance Companies' ability to compete, and not only with each other. The Guidelines and Membership Standards, which Defendant Insurance Companies created, control, and enforce, and with which each must agree to comply as part of the License Agreements, establish two key output restrictions on non-Blue competition, which have been quoted above.

317.     First, in 1994, the Defendants adopted what is known as the Local Best Efforts Rule. Under this rule, each Defendant Insurance Company agrees that at least 80% of the annual revenue that it or its subsidiaries generate from within its designated Allocated Territory (excluding Medicare and Medicaid) shall be derived from services offered under Blue Cross and Blue Shield marks and names.

318.     Second, in 2005, the Defendants adopted what is known as the National Best Efforts Rule. Under this rule, each Defendant Insurance Company agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside or outside of its designated Allocated Territory (excluding Medicare and Medicaid) shall be attributable to services sold under Blue Cross and Blue Shield marks and names. The Guidelines provide that national enrollment can be substituted for annual revenue, which constitutes an alternative restriction that a Defendant Insurance Company will derive no less than 66-2/3% of its national enrollment from its Blue-branded business. The initial term of the National Best Efforts Rule

lasted until 2015, at which point the Defendant Insurance Companies decided that they would agree to its continuation.

319.    These provisions place an output restriction on Defendant Insurance Companies' non-Blue business and limit the extent to which Defendant Insurance Companies can compete with other co-conspirator licensees under non-Blue marks, *i.e.* green competition.  These output restrictions directly limit the ability of each Defendant Insurance Company to compete and generate revenue from non-Blue branded, *i.e.* green, business and thereby restrict each company's ability to develop non-Blue brands that could compete with Defendant Insurance Companies or non-Blue plans of the Defendant Insurance Companies and other insurance companies for National Account business.  These provisions further discourage and disincent each Defendant from developing and competing through any non-Blue branded businesses.

320.    The one-third cap on national non-Blue branded revenue reduces to a minimal level the incentive, if any, and the ability of each Defendant Insurance Company to compete outside of its Allocated Territory.  To do so, the Defendant Insurance Company would have to buy, rent, or build a provider network under a non-Blue brand while ensuring that revenue derived from that brand did not exceed the one-third as of its national revenue.  Thus, the potential upside of investing in developing business outside of a designated area is severely limited, which obviously discourages the investment needed to compete.

321.    Each Defendant Insurance Company also agreed that they would not develop a provider network outside of its Allocated Territory.

322.    In sum, each Defendant Insurance Company has agreed with its actual or potential competitors that each of them will exercise the exclusive right to use the Blue brand within a designated geographic area, derive none of its revenue from services offered under the Blue

brand outside of that area, and derive at most one-third of its revenue by offering services under a non-Blue brand. The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand. Together, these restrictions eliminate all Blue-branded competition among Defendant Insurance Companies for National Accounts and severely limit non-Blue branded (or green) competition between Defendant Insurance Companies for National Accounts.

323.    The foregoing restrictions on the ability of Defendant Insurance Companies to generate revenue outside of their Allocated Territory constitute agreements between competitors to both limit output and allocate geographic markets, and therefore are *per se* violations of §§ 1 and 3 of the Sherman Act.

324.    Each Defendant Insurance Company has abided by the foregoing restrictions on the ability of Defendant Insurance Companies to generate revenue outside of their Allocated Territory during the relevant time period.

325.    The largest Defendant Insurance Company, Anthem, Inc., is a publicly-traded company and has acknowledged the restrictions to which it continues to agree. In its Form 10-K filed February 20, 2019, Anthem stated that it had "no right to market products and services using the BCBS names and marks outside of the states in which we are licensed to sell BCBS products." Anthem has further stated that the "license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined local net revenue, as defined by the BCBSA, attributable to health benefit plans within its [Allocated Territory] must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least two-thirds of a licensee's annual combined

national net revenue, as defined by the BCBSA, attributable to care plans and related services

sold, marketed, administered or underwritten under the BCBS names and marks[.]"

326.    Likewise, in its Form 10-K filed March 1, 2019, Triple-S Management Corp.,

which has been allocated Puerto Rico, explained that "[p]ursuant to our license agreements with

BCBSA, at least 80% of the revenue that we earn from health care plans and related services in

[its Allocated Territory] and at least 66.7% of the revenue that we earn from (or at least 66.7% of

the enrollment for) health care plans and related services both in [and outside its Allocated

Territory], must be sold, marketed, administered, or underwritten through use of the BCBS"

name and mark.  Further, Triple-S Management Corp. stated that the territorial restrictions "may

limit the extent to which we will be able to expand our health care operations, whether through

acquisitions of existing managed care providers or otherwise, in areas where a holder of an

exclusive right to the BCBS names and marks is already present."

327.    Despite these public admissions, both BCBSA and the Defendant Insurance

Companies have otherwise attempted to keep the territorial restrictions as secret as possible.

328.    When asked by the Insurance Commissioner of Pennsylvania to "[p]lease describe

any formal or informal limitations that BSBSA [sic] places on competition among holders of the

[Blue] mark as to their use of subsidiaries that do not use the mark," BCBSA's general counsel

responded that "BCBSA licensed companies may compete anywhere with non-Blue branded

business . . . .  The rules on what the plans do in this regard are contained in the license.

However, the license terms themselves are proprietary to BCBSA, and . . . we would prefer not

to share such trade secrets with BCBSA's competitors."[19]

---

[19]    *See* Def. Blue Cross and Blue Shield Association's Answer and Affirmative Defenses to
Subscriber Track Amended Consol. Class Action Compl. at ¶ 360, *BCBS MDL*, ECF No. 295.

329.     The Defendant Insurance Companies have agreed amongst themselves and with the BCBSA to impose harsh penalties on those that violate the territorial restraints or output restrictions.

330.     According to the Guidelines, a Defendant Insurance Company that violates one of the territorial restraints could face "[l]icense and membership termination."  If a Defendant Insurance Company's license and membership are terminated, it loses the use of the Blue brands. In addition, in the event of termination, the Defendant Insurance Company must pay a fee to other Defendant Insurance Companies through BCBSA.

331.     According to Anthem's February 20, 2019 Form 10-K filing, that "Re-establishment Fee," which was $98.33 per enrollee through December 31, 2018, would be used to "fund the establishment of a replacement Blue Cross and/or Blue Shield licensee in the vacated area [*i.e.* Allocated Territory]" and, were that amount applied to all of Anthem's enrollees in a Blue-branded plan as of December 31, 2018, Anthem would be assessed more than $3 billion.

332.     Similarly, in a published opinion, the United States District Court for the District of Columbia found that if Anthem were to fail to comply with the "best efforts" rule and had to pay the re-establishment fee, the cost would be "close to $3 billion."  *Anthem*, 236 F. Supp. at 259, n.41.

333.     The re-establishment fee is sufficiently large to dissuade Defendant Insurance Companies from violating their collectively-set restraints on competition and facing possible loss of their licenses.

334.     In sum, a terminated Defendant Insurance Company would:  (1) lose the brand through which it derived the majority of its revenue; and (2) fund the establishment of a

competing health insurer that would replace it as the Defendant Insurance Company in its local area.  These penalties amount to a threat by the BCBSA and Defendant Insurance Companies to put any individual Defendant Insurance Company that breaches the territorial restrictions out of business.

335.    The Defendant Insurance Companies would compete with each other for National Accounts but for the horizontal agreement not to do so.  Historically, Defendant Insurance Companies and their predecessors competed, and to this day, some Defendant Insurance Companies compete against each other in certain limited areas that, while protected from much competition, are not exclusively allocated to a single Defendant Insurance Company.

336.    Furthermore, while there are numerous Defendant Insurance Companies, and non-Blue competitors owned by such companies, that could and would compete effectively in each other's Allocated Territory but for the output and territorial restrictions, almost none of the non-Blue (green) competitors compete for National Accounts outside the agreed upon Allocated Territories.

337.    Since entering the License Agreement and absent a ceding agreement or other exception, no Defendant Insurance Company has competed under a Blue mark and/or trade name outside of its designated Allocated Territory.

338.    The Defendant Insurance Companies do not need the Allocated Territories to compete with national insurers.  In the absence of the Allocated Territories, the Defendant Insurance Companies could still use the Blue Card program and access to each other's networks to service National Accounts.  In fact, several Defendant Insurance Companies already are some of the largest insurers in the country and otherwise compete with other insurers on a nearly nationwide basis via Medicaid programs.

339.     Furthermore, allowing all Defendant Insurance Companies to bid on National Accounts within the existing Allocated Territories will not undermine the ability of Defendant Insurance Companies to service their local area.  The Defendant Insurance Companies would remain free to focus on their local areas, and the existence of the Allocated Territories as to National Accounts does not enhance efficiency.  The very fact that the Defendant Insurance Companies worked in tandem with BCBSA to merge and operate statewide or broader shows that the Defendant Insurance Companies are not focused, and need not be focused, on local areas, and this point is further bolstered by the existence of large, multi-state Defendant Insurance Companies like Anthem and HCSC.

340.     The Defendants do not need the Allocated Territories or the best-efforts restrictions to identify the source of any trademarked services or avoid confusion as to the source of any trademarked services among consumers.  To the contrary, there are many significantly less-restrictive means to eliminate any potential confusion as to the source of ASO or other services, such as requiring that each Defendant use its actual name to identify the source of the services.

341.     The output and territorial restrictions for National Accounts agreed to by all Defendant Insurance Companies operate to restrain competition among the Defendant Insurance Companies with each other.  These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from multiple Defendant Insurance Companies being able to bid for National Accounts and no matter how much premiums and other costs would be reduced if competition were permitted.  The result is that the Plaintiffs and other National Accounts have paid the Defendant Insurance Companies supracompetitive prices

to purchase insurance services that have significantly exceeded the price they would have paid but for the unlawful conduct alleged herein.

## IX.    THE BCBSA LICENSE AGREEMENTS HAVE INJURED COMPETITION FOR NATIONAL ACCOUNTS THROUGHOUT THE UNITED STATES

342.    The individual Defendant Insurance Companies, as licensees, members, and parts of the governing body of BCBSA, have conspired with each other (the member plans of BCBSA) and with BCBSA to create, approve, abide by, and enforce the restraints and regulations of BCBSA, including the *per se* illegal territorial and output restrictions in the License Agreements and Guidelines.

343.    But for these illegal agreements, many of the individual Defendant Insurance Companies would otherwise be significant competitors of each other for National Accounts throughout the United States, thereby increasing output.  As alleged above, 15 of the 25 largest health insurance companies in the country are Defendant Insurance Companies:  if all of these companies, together with all other Defendant Insurance Companies, were able to compete with each other, the result would be significantly lower prices for National Account ASO plans and thus lower costs paid by Plaintiffs.

344.    During the relevant time period, Defendant Insurance Companies' illegal anticompetitive conduct has restrained competition for National Accounts and significantly increased price by depriving National Accounts of competition in the relevant market from one or more additional individual Defendant Insurance Companies at lower prices set by a competitive market that is free from the restraints imposed by the Defendants on the market.

345.    The Defendants themselves, in internal documents, have recognized the anticompetitive nature of their illegal conduct.  For example, in a summary of conversations with four Blue CEOs from 1986, it is stated that "the major advantage" of Allocated Territories was

"in the lessening of competition."  Further, a Defendant Insurance Company CEO stated, "[Blues] benefit from the exclusive service areas because it eliminates competition from other Blue Plans," and that without the exclusive service areas, "there would be open warfare."

346.    The illegal anticompetitive conduct of the Defendant Insurance Companies has also led to immense financial windfalls for the Defendant Insurance Companies and their executives.  During the 1980s and afterwards, the Defendant Insurance Companies began to operate less like charitable entities and more like for-profit corporations, accumulating substantial surpluses.  In 1986, Congress revoked the Blues' tax-exempt status, freeing them to form for-profit subsidiaries.

347.    In 1992, BCBSA ceased requiring Defendant Insurance Companies to be not-for-profit entities.  As a result, many Defendant Insurance Companies converted to for-profit status, leading to massive growth.  Anthem, for example, became the largest health insurance company in the country as measured by enrollment.

348.    While nominally still characterized as not-for-profit, a number of the individual Defendant Insurance Companies generate substantial earnings and surpluses, and they pay their senior administrators and officials substantial salaries and bonuses—often in the multi-million dollar range.

349.    For example, in its latest report on the topic, issued in June 2015, the Consumers Union of Consumer Reports found that nine non-profit Defendant Insurance Companies held excess reserves of over $12 billion at the end of 2014.  *See* Dena Mendelsohn, *How Much is Too Much:  Nonprofit Insurer Surplus After the ACA*, CR CONSUMER REPORTS (June 2015), https://advocacy.consumerreports.org/research/how-much-is-too-much-nonprofit-insurer-surplus-after-the-aca/ (last accessed May 23, 2022).

350.     As an example of excessive executive compensation, in 2018, HCSC paid its

CEO Paula Steiner $14 million and, that same year, paid its former CEO Patricia Hemingway

Hall $3 million, down from $18 million it paid Hall in 2016.  HCSC also paid its board members

and COO large sums.  *See* Stephanie Goldberg, *Blue Cross bosses rake in the green*, CRAIN'S

CHICAGO BUSINESS (Oct. 11, 2019), https://www.chicagobusiness.com/healthcare/blue-cross-

bosses-rake-green.

## X.     DEFENDANTS' CONDUCT HAS NO PROCOMPETITIVE JUSTIFICATIONS

351.     Whatever encouragement that the Allocated Territories provided individual

Defendant Insurance Companies to promote the Blue brand within their Allocated Territories has

no relationship to the scheme whereby a single Defendant Insurance Company is allocated the

exclusive right to bid on a National Account with employees outside of that Defendant Insurance

Company's Allocated Territory.

352.     The Allocated Territories could exist without allocating the National Accounts.

353.     Likewise, the allocation of National Accounts is not needed to protect the Blue

marks or enable productive cooperation, but instead is employed to reduce horizontal

competition.  As Defendant Insurance Companies themselves have admitted:

- "One CEO reported that 'Plans benefit from the exclusive services areas because it eliminates competition from other Blue Plans and that without service areas there would be open warfare.'"  308 F. Supp. 3d at 253.

- "A summary of conversations with four Blue CEOs states 'the major advantage of an exclusive franchise area was seen in the lessening of competition….'"  *Id.*

- "Plan CEOs stated that ESAs create larger market share because other Blues stay out and do not fragment the market."  *Id.*

- Defendants admit that their market allocation scheme is not necessary to protect the Blue Marks:  "Unique issues arising in overlapping service areas can be addressed by reasonable interpretations of the BCBSA rules and regulations, which preserve the integrity of the Brands yet allow Plans to coexist in

overlapping service areas." *BCBS MDL*, ECF No. 1436-100 at 8; *BCBS MDL*, ECF No. 1436-77.

- The BCBSA VP of Consumer Strategy stated that "Brands are not protected by the ESAs but the ESAs protect the Plans' business model…." *BCBS MDL*, ECF No. 1436-82.

- Defendants admit that the effect of their market allocation is to suppress competition and that without it "Plans would not be able to protect themselves from out of area [Blue] competition" (*BCBS MDL*, ECF No. 14436-13 at BCBSF-00181534); and that "Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans." *BCBS MDL*, ECF No. 1436-19 at BDCBSA 00083738.

354. Similarly, the MDL Court found that the market allocation scheme does not further any new or unique product offering:

> Defendants cannot claim they produce a unique product. The market allocations at issue are not necessary to market, sell or produce health insurance…. The plan to go to ESAs constituted a new marketing/sales strategy, not a new product. The products remain exactly the same—commercial insurance and insurance services.

308 F. Supp. 3d at 1269-70.

355. The allocation of National Accounts does not facilitate interbrand competition. Although Defendant Insurance Companies sometime use common trademarks, each is an independent competing producer of insurance services. 308 F. Supp. 3d at 1267. None of the Defendant Insurance Companies simply distribute the products or services produced by others. Their market allocation scheme eliminates direct horizontal competition between firms that produce the service in question, *i.e.*, providing insurance services to National Accounts.

## XI.   THE PUTATIVE SUBSCRIBER CLASS ACTION SETTLEMENT

356. Plaintiffs herein do not seek to infringe on the Rule 23(b)(2) indivisible injunctive relief provided to all class members in the putative subscriber MDL class action settlement agreement (the "Settlement Agreement"). The MDL Court has explained that "a Rule 23(b)(3) opt out reserves the right to pursue divisible relief including monetary relief and divisible

injunctive relief."  *BCBS MDL*, ECF No 2897.  As the MDL Court has further explained, "[t]he relief a Rule 23(b)(3) opt out may pursue is limited only to the extent that such relief may not infringe on the Rule 23(b)(2) indivisible injunctive relief approved by the court."  (*Id.*)  All Plaintiffs have filed timely exclusion requests and validly opted out of the subscriber MDL class action.

357.    The Settlement Agreement defines the (b)(2) injunctive relief class as "all Individual Members, Insured Groups, Self-Funded Accounts, and Members that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan during the Settlement Class Period."  Settlement Agreement, *BCBS MDL*, ECF No. 2610-2 ("SA") at § 1.pp (emphasis added).  This expansive class definition includes current and former fully-insured individuals, self-insured individuals, health benefit plans, group accounts, employers, employees (including their spouses and dependents), sponsors, administrators, fiduciaries, trade associations, and both ERISA and non-ERISA plans and participants.  SA at §§ 1.mm, uu, qq, ccc.

358.    Plaintiffs "preserve absolutely their right to litigate."  *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 385 (1996); *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 351 (1983); *Butzen v. Mid-States Exp., Inc.*, No. 07 C 5716, 2008 WL 515165, at *2 (N.D. Ill. Feb. 25, 2008) (an opt-out of a class settlement "will not be bound by it"); *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 353–54 (N.D. Ohio 2001) ("If the claimant timely and properly exercises his opt-out right, he may initiate, continue with, or otherwise prosecute any legal claim against the defendants, without any limitation, impediment or defense arising from the terms of the settlement agreement.").

359.     At the MDL Fairness Hearing, Defendants affirmed that they "[a]bsolutely [and] totally agree[d]" that "nothing about the approval of [the] settlement affects [opt-outs'] ability to prove in their individual case a Sherman Act violation." *BCBS MDL*, ECF No. 2864 at Tr. I-169. The MDL Court reiterated upon Final Order and Judgment approving the class settlement that "if [self-funded accounts] opt out of the 23(b)(3) Class (sometimes referred to as the "Damages Class"), they retain the right not only to seek monetary damages, but also to seek divisible, individualized injunctive relief." *BCBS MDL*, ECF No. 2931 at 24.

360.     Notwithstanding anything set forth above, the individualized injunctive relief that Plaintiffs seek herein is limited to enjoining Defendants from restricting the ability of the Plaintiffs to seek and receive from the Defendant Insurance Companies additional competitive bids for their business.  Plaintiffs seek such an order of injunctive relief only for themselves and not for other National Accounts.  Plaintiffs are asserting only divisible injunctive relief and seeking only the ability of the Plaintiff National Accounts to seek, and the Defendant Insurance Companies to provide, additional competitive bids to Plaintiffs.

## XII.   TOLLING OF THE STATUTE OF LIMITATIONS

361.     The statutes of limitation as to Defendants' continuing antitrust violations alleged in this Complaint were tolled by the pendency of one or more class action complaints, including the original *Cerven* complaint[20], and any amendments thereto, against Defendants for the illegal output restrictions and market allocation agreements alleged herein.

---

[20]     Complaint, *Cerven et al v. Blue Cross and Blue Shield of North Carolina et* al, 2:12-cv-04169, Dkt. 1.

## XIII.   <u>VIOLATIONS ALLEGED</u>

### <u>Count One</u>
(*Per Se* Violations of §§ 1 and 3 of the Sherman Act)
(Asserted Against All Defendants)

362.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

363.    The License Agreements, Membership Standards, Rules, and Guidelines agreed to by the individual Defendant Insurance Companies and BCBSA represent horizontal agreements entered into by and between the individual Defendant Insurance Companies, all of whom are actual competitors or potential competitors in the market for National Accounts.

364.    Each of the License Agreements, Membership Standards, Rules, and Guidelines entered into between BCBSA and the individual Defendant Insurance Companies represents a contract, combination, and/or conspiracy within the meaning of §§ 1 and 3 of the Sherman Act.

365.    Through the License Agreements, Membership Standards, Rules, and Guidelines, BCBSA and the individual Defendant Insurance Companies have combined, conspired, and agreed to limit output and allocate customers and geographic markets for the sale of commercial health insurance services.  In particular, the Defendants have entered into horizontal combinations, conspiracies, or agreements among actual or potential competitors to:  (1) allocate geographic territories or customers among Defendant Insurance Companies and decide through collective action that they will not compete against each other by using the Blue trademarks or trade names for the business of National Accounts; (2) adhere to the National Best Efforts Rule, which directly restricts the non-Blue output that each Defendant Insurance Company is allowed to offer to the market outside of its designated territory; and (3) adhere to the Local Best Efforts Rule, which directly restricts the non-Blue output that each Defendant Insurance Company can offer within its designated exclusive territory.

366.     Each of the three horizontal agreements specified in the paragraph immediately above is a horizontal agreement among actual or potential competitors that constitutes a *per se* violation of §§ 1 and 3 of the Sherman Act.

367.     As a direct and proximate result of the individual Defendant Insurance Companies and BCBSA's continuing violations of §§ 1 and 3 of the Sherman Act described above, Plaintiffs have suffered antitrust injury in that they have directly paid higher than the competitive rate for services purchased from the Defendants and from other market participants.  These payments have occurred on no less than a monthly basis and each payment to Defendants has caused injury to Plaintiffs.

368.     The Defendant Insurance Companies and the BCBSA are jointly and severally liable to the Plaintiffs in treble the amount of the actual damages suffered by the Plaintiffs plus an award of the reasonable attorneys' fees and costs incurred in prosecuting this action, all as provided for by § 4 of the Clayton Act (15 U.S.C. § 15).  Plaintiffs also seek and are entitled to recover divisible injunctive relief that does not infringe on the indivisible injunctive relief previously award to the Subscriber Class in the case captioned *In re Blue Cross Blue Shield Antitrust Litigation*, MDL 2406, Case No. 2:13-cv-20000-RDP (N.D. Ala.), as provided for by § 16 of the Clayton Act (15 U.S.C. § 26), and allowed by any judgment entered by the MDL Court in the aforementioned Subscriber class action suit.  *See BCBS MDL*, ECF Nos. 2931, 2939.

### Count Two
(Rule of Reason Violations of §§ 1 and 3 of the Sherman Act)
(Asserted Against All Defendants)

369.     Plaintiffs repeat and reallege the allegations in all Paragraphs above.

370.     The Defendant Insurance Companies have market power, *i.e.*, the power to profitably raise price above the competitive level, in the sale of U.S. health insurance services to

National Accounts, the relevant geographic and product market alleged herein, *i.e.* the National Accounts Health Insurance Services market.

371.    The License Agreements, Membership Standards, Rules, and Guidelines agreed to by and among the Defendant Insurance Companies represent horizontal agreements entered into between and among the individual Defendant Insurance Companies, all of whom are competitors or potential competitors in the market for commercial healthcare insurance to National Accounts in the United States and BCBSA.

372.    Each of the License Agreements, Membership Standards, Rules, and Guidelines entered into between BCBSA and the Defendant Insurance Companies represents a contract, combination and/or conspiracy within the meaning of §§ 1 and 3  of the Sherman Act.

373.    Through the License Agreements, Membership Standards, Rules, and Guidelines, BCBSA and the Defendant Insurance Companies have agreed to and have, in fact, restricted output and allocated customers, including the Plaintiffs, who purchase commercial health insurance services.  By so doing, Defendant Insurance Companies and the BCBSA have unreasonably injured competition in the relevant market for providing commercial health insurance services to National Accounts within the United States.  In particular, the Defendants' allocation of geographic areas and/or customers and the output restrictions the Defendants have imposed on the market through the National Best Efforts Rule and Local Best Efforts Rule have significantly increased above the competitive level the price paid by National Accounts, including the Plaintiffs, for commercial health care insurance services in the United States.  These output restriction agreements and market allocation agreements unreasonably injure competition within the meaning of §§ 1 and 3 of the Sherman Act.

374.     The output restrictions and market allocation agreements entered into among the individual Defendant Insurance Companies (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are not only *per se* illegal, they are also unreasonably anticompetitive and violate the Rule of Reason.

375.     Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant market, including but not limited to the following:

  a. Allowing the Defendant Insurance Companies to artificially and unreasonably raise the prices charged to National Accounts substantially above the competitive level;

  b. Substantially restricting output, especially with respect to non-Blue branded plans and competition; and

  c. Depriving the Plaintiffs and others of the benefits of free and open competition, including a greater consumer choice, greater market entry, lower prices, and higher quality services.

376.     The challenged anticompetitive agreements do not provide any procompetitive benefits.  The restraints are also not necessary or ancillary to any purported joint venture among the Defendants.  Furthermore, the anticompetitive agreements are neither ancillary nor necessary to any legitimate or procompetitive conduct or effect or to the ability of the Defendant Insurance Companies to offer commercial health insurance services under a Blue mark or name.

377.     In addition, any possible procompetitive effects that could conceivably result from the output restraint and market allocation agreements alleged herein would be clearly and substantially outweighed by the anticompetitive effects detailed above.  Furthermore, any possible procompetitive effects could be achieved by significantly less restrictive measures.  The

output restrictions and market allocation agreements in the License Agreements, Membership Standards, Rules, and Guidelines therefore are not only *per se* illegal, as set forth in Count I above, but also unreasonably restrain trade in violation of the Rule of Reason.  The combination of and agreements to restrict output, allocate markets, and restrain trade adversely affects Plaintiffs by depriving them, among other things, of the opportunity to purchase health insurance services from a lower cost competitor at a lower price set by a free market unencumbered by Defendants' anti-competitive agreements.  As a result of the Defendants' market allocation agreement, National Best Efforts Rule and Local Best Efforts Rule the Defendant Insurance Companies have not competed against each other for National Accounts and have been precluded by such agreement and restraints from doing so.

378.    Likewise, the Defendant Insurance Companies have been precluded from competing for National Accounts both inside and outside of their respective Allocated Territory under non-Blue brands.  This has prevented entry of Defendant Insurance Companies into the market for National Accounts, restricted the output of health insurance services, and raised the prices for such services substantially above what they would have been but for the illegal restraints.

379.    As a direct and proximate result of the Defendants' continuing violations of §§ 1 and 3 of the Sherman Act described in this Complaint, Plaintiffs have suffered antitrust injury and damages in an amount to be proven at trial.  These damages consist of having paid artificially inflated, unreasonable, and/or supracompetitive and higher prices for National Account Health Insurance Services to both the Defendant Insurance Companies and to other market participants than they would have but for the Defendants unlawful, anticompetitive agreements.  These damages have accrued anew each time Plaintiffs have paid such prices and

have been denied the benefits of competition for their National Account Health Insurance Services contracts.

380.    The Defendant Insurance Companies and the BCBSA are jointly and severally liable to the Plaintiffs in treble the amount of the actual damages suffered by the Plaintiffs plus an award of the reasonable attorneys' fees and costs incurred in prosecuting this action, all as provided for by § 4 of the Clayton Act (15 U.S.C. § 15).  Plaintiffs also seek and are entitled to recover divisible injunctive relief that does not infringe on the indivisible injunctive relief previously award to the Subscriber Class in the case captioned *In re Blue Cross Blue Shield Antitrust Litigation, MDL 2406*, Case No. 2:13-cv-20000-RDP (N.D. Ala.), as provided for by § 16 of the Clayton Act (15 U.S.C. § 26), and allowed by any judgment entered by the MDL Court in the aforementioned Subscriber class action suit.  The MDL Court has explained that "a Rule 23(b)(3) opt out reserves the right to pursue divisible relief including monetary relief and divisible injunctive relief."  *BCBS MDL*, Case No. 2:13-cv-20000-RDP, ECF No. 2897.  As the MDL Court has further explained, "[t]he relief a Rule 23(b)(3) opt out may pursue is limited only to the extent that such relief may not infringe on the Rule 23(b)(2) indivisible injunctive relief approved by the court." *Id.*

## XIV.  **RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that this Court:

a.    Hold the Defendants to be jointly and severally liable to the Plaintiffs and award Plaintiffs treble the amount of the damages they have sustained;

b.    Award Plaintiffs pre-judgment interest;

c.    Award Plaintiffs their costs and attorneys' fees;

d.    Award Plaintiffs such divisible injunctive relief necessary to prevent future loss or harm without infringing upon the indivisible injunctive relief

provided to all class members in the putative subscriber class settlement in *In re Blue Cross Blue Shield Antitrust Litigation*, MDL 2406, Case No. 2:13-cv-20000-RDP (N.D. Ala.);

e.     Adjudge and decree that BCBSA and Defendant Insurance Companies have violated §§ 1 and 3 of the Sherman Act;

f.     Adjudge and decree that the BCBSA has used or is using the Blue Shield trademarks and the Blue Cross trademarks to violate the antitrust laws of the United States; and

g.     Award any such other and further relief as may be just and proper.

## TRIAL BY JURY DEMANDED

This the 27th day of September, 2022.

Respectfully submitted,

By:  _____/s/*Jon Corey*_____
Jon Corey
Shahin Rezvani
MCKOOL SMITH, PC
One California Plaza
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
(213) 694-1200
jcorey@mckoolsmith.com
srezvani@mckoolsmith.com

John Briody
James Smith
Daniel Hendler
MCKOOL SMITH, PC
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001
(212) 402-9400
jbriody@mckoolsmith.com
jsmith@mckoolsmith.com
dhendler@mckoolsmith.com

Lew LeClair
Gary Cruciani
MCKOOL SMITH, PC
300 Crescent Court, Suite 1500
Dallas, Texas 75201
(214) 978-4000
lleclair@mckoolsmith.com
gcruciani@mckoolsmith.com

*Attorneys for Plaintiffs*